**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITIGROUP GLOBAL MARKETS INC., d/b/a SMITH BARNEY, | ) ) ) | **FILED: APRIL 16, 2008** |
| Plaintiff, | ) ) | **08CV2175           TC** |
| v. | ) ) ) | **JUDGE KENNELLY** |
| PAUL OBLON, | ) ) | **MAGISTRATE JUDGE COLE** |
| Defendant. | ) ) ) | |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff Citigroup Global Markets Inc., d/b/a Smith Barney ("Smith Barney"), for its

Verified Complaint against Defendant Paul J. Oblon ("Oblon"), states as follows:

**SUMMARY OF THE CASE**

1.      Oblon is a former Smith Barney vice president who now works for Wachovia

Securities, LLC ("Wachovia"), a direct competitor of Smith Barney in the retail brokerage

industry.  Smith Barney recently learned that Oblon, while still working for Smith Barney, began

soliciting Smith Barney clients to move their accounts to Wachovia.  Smith Barney personnel

have recently discovered that, when Oblon left for Wachovia, he took with him Smith Barney's

confidential information regarding several important clients.  Oblon is using that information to

divert these clients' accounts to Wachovia.  Already, Oblon has diverted accounts with

approximately $45 million in assets from Smith Barney.  Oblon's conduct violates the contracts

Oblon agreed to as a condition of his employment with Smith Barney and constitutes

misappropriation of trade secrets.  Oblon should be enjoined from soliciting Smith Barney

customers in violation of his agreements and from using Smith Barney's confidential client

information.

148254v4

2.      From September 15, 1999 until March 14, 2008, Oblon worked as a financial advisor in Smith Barney's branch office in Naperville, Illinois.  On March 14, 2008, Oblon resigned from Smith Barney, without notice, and immediately began working for Wachovia in that firm's Naperville, Illinois office.

3.      Before he resigned from Smith Barney, while he still worked as a Smith Barney employee and agent, Oblon solicited clients to leave Smith Barney and move their accounts to Wachovia.  Oblon also solicited at least one Smith Barney employee to quit and join him at Wachovia.

4.      After Oblon resigned, his former assistant discovered that Oblon had taken documents from several Smith Barney client files, including Client Profiles printed from Smith Barney's computer system and other financial records.  Oblon took nearly every document from the file of the largest client he serviced while at Smith Barney, who had over $25 million in assets with Smith Barney.  Oblon also took files related to several other large clients.  The documents Oblon took contain client names, contact information, investment history, account data, asset allocations and other sensitive financial information.

5.      Within the last week, Smith Barney learned that Oblon is soliciting clients originated by another financial advisor, Edward Konrad ("Konrad").  Oblon is using confidential information he took from Smith Barney to contact clients originated by, and assigned to, Konrad.

6.      Through these actions, Oblon has breached, and is continuing to breach, the non-solicitation and confidentiality covenants in contracts he entered into with Smith Barney and is misappropriating Smith Barney's trade secrets.

7.      Smith Barney seeks a temporary restraining order and preliminary injunction enjoining Oblon from: (a) destroying any records Oblon removed from Smith Barney; (b) using,

- 2 -

disclosing, or transmitting for any purpose the information contained in the records of Smith

Barney, including personal and financial information of Smith Barney's clients; (c) using Smith

Barney's client information to contact or solicit customers assigned to other Smith Barney

brokers; and (d) initiating any further contact or communication with, including soliciting any

business from, customers whom Oblon had contact with or whose name became known to him

while in the employ of Smith Barney (except those customers he identified in connection with

his resignation letter).  In addition, Oblon should be ordered to immediately return all original

Smith Barney records and copies thereof.

8.       Smith Barney is a member firm, and Oblon is a member person, of the Financial

Industry Regulatory Association ("FINRA").  Pursuant to Rule 13804 of FINRA's Code of

Arbitration Procedure, the parties are subject to mandatory arbitration of this dispute before

industry panelists.  Smith Barney seeks injunctive relief from this Court only until such time as

the arbitrators are impaneled and rule on the merits of Smith Barney's request.  By industry rule

and custom, the arbitration panel will be in place and schedule a hearing within 15 days after any

injunctive order by this Court is entered.

9.       Smith Barney has filed an arbitration petition with FINRA seeking a permanent

injunction against Oblon and other relief.  The interim injunction that Smith Barney now seeks is

intended only to maintain the *status quo* until the FINRA arbitration panel can resolve the case

on the merits.

## PARTIES

10.      Smith Barney is a corporation organized and existing under the laws of the State

of New York.  Smith Barney's principal place of business is in New York.

11.      Oblon is an individual who, on information and belief, resides in Naperville,

Illinois.

148254v4

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and this action

is between citizens of different states.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), as it is the

district in which Oblon resides and in which a substantial part of the events giving rise to the

claims occurred.

## FACTUAL BACKGROUND

### A.      Oblon's Employment With Smith Barney

14.     On September 15, 1999, Oblon entered into a Promissory Note and Forgivable

Loan Agreement with Solomon Smith Barney Inc. (the "Loan Agreement," Exhibit A hereto).

Since that time, Citibank Global Markets Inc. (referred to herein as Smith Barney) has succeeded

to the rights and duties of Solomon Smith Barney, Inc. under the Loan Agreement.

15.     In the Loan Agreement, Oblon agreed that he would not use client information for

anything other than his job duties at Smith Barney and that he would not solicit clients he learned

of while at Smith Barney for a period of one year after the end of his employment with Smith

Barney:

> Borrower understands that any client record and information, including names,
> addresses, telephone numbers and account information, whether generated by the
> Lender or Borrower, are confidential and proprietary information and important
> business assets of the Lender.  This information is extremely valuable to the
> Lender, is not generally known outside of the Lender, is unique and cannot be
> easily duplicated or acquired.  Borrower agrees to use such information only in
> the normal course of Lender's business and will not remove any client-related
> records from Lender's premises, whether in original or copied form.  Borrower
> further agrees that for a period of one year following Borrower's termination of
> employment from the Lender, for any or no reason, Borrower will not solicit,
> contact, accept or do business with any clients that Borrower learned of during
> employment with the Lender, other than those clients which Borrower may have
> brought with Borrower and for whom the Borrower was the broker of record at

- 4 -

> Borrower's prior employer.  In addition, should Borrower's employment
> terminate for any or no reason prior to the expiration of the Note, then the
> Borrower agrees not to solicit, contact, accept or do business with any client the
> Borrower learned of during Borrower's employment for the remaining term of the
> Note.

Ex. A, ¶ 13.

16.    Oblon also agreed that any breach of the Loan Agreement would lead to

immediate and irreparable injury:

> In the event Borrower breaches any part of this paragraph, the Borrower agrees that the
> Lender will suffer Immediate and Irreparable harm and that money damages will not be
> sufficient to compensate the Lender or to protect the status quo.

*Id.*

17.    Oblon was later assigned to a brokerage team led by Konrad, a senior Smith

Barney broker.  Konrad was contemplating retirement and envisioned eventually transitioning

his clients to Oblon.  To protect Konrad's client base in the event Oblon resigned from Smith

Barney, Oblon was required to sign a Joint Production Agreement ("Joint Production

Agreement," Exhibit B hereto (without exhibits)).  The Joint Production Agreement provides that

Konrad and Oblon would service certain clients and split the commissions generated by these

clients, with Konrad getting 90% of such proceeds and Oblon getting 10%.  The clients subject

to the Joint Production Agreement were Konrad's clients.  Konrad had a long term relationship

with these clients, some of which had been Konrad clients for over ten years.

18.    In the Joint Production Agreement, Oblon again agreed to protect the

confidentiality of Smith Barney's trade secrets and confidential information and not to use such

information other than in performing his duties at Smith Barney.  The Joint Production

Agreement provides:

> The Producers [Oblon and Konrad] recognize and agree that all records, whether
> original, duplicated, computerized, memorized, handwritten, or in any other form,
> and all information contained herein, including names, addresses, telephone

numbers, and financial information ("information") of any account/household or Plan Account brought to the Joint Number by the other Producer, whether or not actually designated on Exhibit A, is confidential and the sole and exclusive property of SB and that other Producer. This information is not generally known outside SB and is confidential and used only on a "need to know" basis. Further, this information is unique and cannot be easily duplicated or acquired. Consequently, the Producers will not use this information or remove any such records from any SB office except for the sole purpose of conducting business on behalf of SB. The Producers agree not to divulge or disclose this information to any third party either during their employment or at any time thereafter.

Ex. B, ¶V.

19.     Oblon also agreed in the Joint Production Agreement not to solicit any Smith

Barney customer subject to the Joint Production Agreement for a period of one year following

his termination:

If, at any time, any of the Producers who are a party to this Agreement resigns from SB, provokes his/her termination, or is terminated for cause, that Producer agrees that for a period of one year following their termination they will not solicit by mail, by telephone, by personal meeting, or by any other means, either directly or indirectly, any account/household or Plan Account brought or introduced to the Joint Number by the other Producer, whether or not actually designated on Exhibit A. This agreement "not to solicit" means that the Producer will not, during their employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever for the purpose of inviting, encouraging or requesting any such account account/household or Plan Account:
(a)     to transfer from SB to them or to their new employer, or
(b)     to open a new account with them or with their new employer, or
(c)  to otherwise discontinue such account's/household's or Plan Account's patronage and business relationship with SB or the other Producer.

Ex. B, ¶VI.

20.     Oblon acknowledged that any violation of the confidentiality and non-solicitation

covenants in the Joint Production Agreement would cause irreparable harm to Smith Barney and

consented to the entry of an interim injunction should any such violation occur:

In the event any of the Producers who are a party to this Agreement breaches any of the covenants of Sections V and VI, that Producer agrees that SB and/or the non-breaching Producer will be entitled to injunctive relief. The Producers recognize that SB and/or the non-breaching producer will suffer Immediate and Irreparable harm and that money damages will not be adequate to compensate SB and/or the non-breaching Producer or to

protect and preserve the status quo.  Therefore, THE PRODUCERS CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER, or A PRELIMINARY or PERMANENT INJUNCTION ordering:

(a)    that they immediately return to SB or to the non-breaching Producer all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever relating to accounts/households or Plan Accounts designated in Exhibit A and/or brought to the Joint Number by another Producer, and that they be enjoined and restrained from using or disclosing any information contained in such records; and

(b)    that, for a period of one (1) year, they be enjoined and restrained from soliciting any account/household or Plan Account designated in Exhibit A and/or brought or introduced to the Joint Number by another Producer, and

(c)    that they be further enjoined and restrained, for a period of one (1) year, from accepting business from any account/household or Plan Account designated in Exhibit A and/or brought or introduced to the Joint Number by another Producer who was solicited in violation of Section VI or whose records and information was used in violation of Section V.

Ex. B, ¶ VII.

**B.    Oblon Violated His Agreements By Soliciting Smith Barney's Clients and Stealing Smith Barney's Confidential Records.**

21.    While still employed by Smith Barney, Oblon solicited Smith Barney clients to leave Smith Barney and to go to Wachovia with Oblon.

22.    On March 13, 2008, while he was still an employee and agent of Smith Barney, Oblon met with an important Smith Barney client who Oblon had been assigned to work with by Smith Barney.  During this meeting, Oblon advised the client that he would be moving to Wachovia, that he "highly recommended" that the client leave Smith Barney, and he requested that the client transfer her accounts to Wachovia for Oblon to manage.  (Attached hereto as Exhibit C is a redacted version of this letter from this client regarding this conversation.)

23.    On information and belief, Oblon solicited many other clients to move their accounts to Wachovia while he was still employed by Smith Barney.  In the weeks immediately before he left Smith Barney, Oblon had an unusual number of client meetings and acted in an unusually secretive manner regarding these meetings, including by meeting behind closed doors

148254v4

or at locations away from the office.  Several of these clients requested that Smith Barney transfer their holdings to Wachovia within days after Oblon resigned, suggesting that Oblon had solicited their business before he resigned.

24.    Prior to his departure from Smith Barney, Oblon also solicited his assistant, Sarah Zimmerman, to leave Smith Barney and to go with him to Wachovia.

25.    Oblon took the documents from several client files, including Client Profiles. Oblon took nearly every record from the file of one client who had over twenty-five million dollars of assets with Smith Barney.  Oblon took the entire physical files for several other large clients, leaving behind only empty folders.

26.    Some of the Client Profiles taken by Oblon, including the one related to the largest account Oblon worked on at Smith Barney, were for clients Oblon learned of only through his employment at Smith Barney.

27.    Oblon resigned on March 14, 2008, without prior notice.  When Oblon resigned, his manager, Phillip Hall ("Hall"), reminded him of his confidentiality obligations and his obligation not to solicit Smith Barney's customers.  Oblon acknowledged this obligation and expressly promised not to solicit Smith Barney's customers, with the sole exception of the individuals identified in a list provided with his resignation letter.  Oblon did not inform Hall that he had improperly taken Smith Barney's Client Profiles, or that Oblon had, prior to his resignation, solicited clients and personnel to leave Smith Barney.  To the contrary, Oblon falsely stated in his resignation letter that he was "leaving all client documents and files in a neat and orderly condition as they were used while I was employed by Smith Barney."  *See* Ex. D hereto.

148254v4

28.     Last week, Smith Barney discovered that Oblon has been contacting several Konrad clients who were subject to the Joint Production Agreement.  Oblon appears to have sent out, or caused to be sent out, a mass mailing to Konrad's clients using confidential information regarding these clients Oblon took from Smith Barney.

29.     On April 16, 2008, Smith Barney learned that Oblon has called at least one long-time Konrad client and solicited her by telephone to move her accounts from Smith Barney to Wachovia.

30.     To date, Oblon has diverted client accounts with more than $45 million in assets to Wachovia.

**C.     Smith Barney's Clients and Goodwill**

31.     Smith Barney's client base and client information are the lifeblood of its business. Smith Barney spends millions of dollars every year on national and local advertising, along with many millions of dollars per year for sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phones, mail, research, literature, seminars, trade and other professional news publications, promotional events, and the retention of experts in tax, asset management, employee and health benefits, insurance, real estate, estate planning, and numerous other sub-specialties.  Smith Barney invests these resources to maintain its goodwill and grow its customer base in the securities industry.

32.     Clients who open accounts with Smith Barney typically develop close relationships with the Smith Barney representatives they deal with, and they entrust those representatives with sensitive financial and personal information.  In part because of these relationships, which Smith Barney encourages and fosters, clients generally remain with Smith Barney for many years.

148254v4

33.    In addition to the support and access to clients and potential clients that Smith Barney provided to Oblon, Oblon benefited directly from the goodwill, reputation, and name recognition generated by Smith Barney.

34.    Smith Barney also provided Oblon with sophisticated financial products to sell to Smith Barney's clients as well as considerable technology and human resources to effectively manage client assets. Smith Barney allowed Oblon access to its clients in reliance on his contractual promises to Smith Barney.

**D.    The Protocol**

35.    Smith Barney, Wachovia and certain other retail brokerage firms are parties to an agreement called the Protocol For Broker Recruiting ("Protocol"). *See* Ex. E hereto. The Protocol is designed to protect the confidentiality of client information. It sets forth in detail what limited client information a departing employee may take to a firm that has agreed to the Protocol. Provided that the departing employee takes only the client information permitted under the Protocol and abides by the notification procedures in the Protocol, his or her former employer will not seek to enforce any non-solicitation covenants with respect to that employee's clients.

36.    Importantly, the Protocol (a) is expressly limited to situations where the former employee follows the procedures in the Protocol and (b) does not cover actions taken by the former employee before he resigns. The Protocol does not restrict the right to enforce non-solicitation covenants in circumstances where a former employee fails to comply with the Protocol procedures. The Protocol also does not affect an employer's rights regarding departing employees who begin soliciting clients prior to leaving their employer. Moreover, the Protocol does not apply when a former employee is a member of a brokerage team. In that situation, the team agreement (here the Joint Production Agreement) governs, not the Protocol. *See* Ex. E at 2.

37.     The Protocol does not apply to Oblon's actions for several reasons.  First, Oblon did not comply with the Protocol, in that he did not disclose to his branch manager the fact that he took client files from Smith Barney.  Instead, he secretly took extremely sensitive client records, then lied about it.  Second, Oblon has violated the Protocol by retaining information concerning clients serviced by another broker, Konrad, and using that information to contact and solicit Konrad's clients.  Third, Oblon violated the Protocol by soliciting clients before he resigned from Smith Barney.

### E.    Smith Barney Aggressively Protects the Confidentiality of Its Client Information

38.     The information Smith Barney has assembled to service its clients, such as the Client Profiles taken by Oblon, cannot be readily duplicated.  The confidential information Smith Barney maintains enables a sophisticated analysis of clients' financial information that is unique to Smith Barney.

39.     This confidential information, if known to competitors such as Wachovia, would put Smith Barney at a considerable disadvantage.

40.     As an employee of Smith Barney and as part of his duties to Smith Barney, Oblon had access to a vast array of information concerning Smith Barney's clients, including their buying and selling habits, their personal holdings, their product preferences, their tolerance for risk and their personal contact information.

41.     Smith Barney limits access to such confidential information through the use of security access cards, copy controlled documents and multiple layers of password protections for computer databases which contain information developed by or provided to Smith Barney.

148254v4

**F.      Injunctive Relief Is Needed to Protect Smith Barney's Business and Client Confidentiality**

42.      As the facts set forth above demonstrate, Oblon is in breach of his agreements not to solicit Smith Barney's clients and not to misuse Smith Barney's confidential client and business information.

43.      Concurrently with this proceeding, Smith Barney is initiating an arbitration before FINRA, seeking a permanent injunction, damages and other relief.  However, absent the interim injunctive relief sought in this proceeding, any award which Smith Barney may obtain in that arbitration would be rendered ineffectual.

44.      Oblon's conduct is harming client relationships that Smith Barney spent considerable time and resources to build.  This harm is irreparable – as Oblon stipulated in his contracts with Smith Barney – because client relationships are inherently delicate and cannot be repaired with money damages.

45.      In circumstances such as these, where Smith Barney invests significant time and money in assuring the confidentiality of its client information and where the dissemination of said information would greatly damage Smith Barney's business, injunctive relief is available to Smith Barney as a matter of right.  Indeed, the Joint Production Agreement provides for entry of an immediate injunction by this Court barring any further solicitations and misuse of Smith Barney's confidential information.

## COUNT I
## BREACH OF CONTRACT-THE LOAN AGREEMENT

46.      Smith Barney repeats and realleges the foregoing paragraphs as if fully set forth herein.

47.      Oblon is contractually bound to abide by the terms of the Loan Agreement he signed.

148254v4

48.     Smith Barney has succeeded to all of the rights and duties under the Loan Agreement formerly possessed by Solomon Smith Barney Inc.

49.     Oblon breached his obligations to Smith Barney under the Loan Agreement by, among other things, (i) soliciting clients of Smith Barney before and after his departure from Smith Barney and (ii) using confidential or trade secret information to compete with Smith Barney.

50.     Smith Barney has performed all of its duties and satisfied all of its obligations under the Loan Agreement.

51.     Smith Barney has been damaged as a result of Oblon's ongoing breaches of his contractual duties.  Smith Barney has suffered irreparable harm as a result of Oblon's conduct and will continue to suffer irreparable harm unless Oblon is enjoined from engaging in any such further conduct.

**COUNT II**
**BREACH OF CONTRACT – THE JOINT PRODUCTION AGREEMENT**

52.     Smith Barney repeats and realleges the foregoing paragraphs as if fully set forth herein.

53.     Oblon is contractually bound to abide by the terms of the Joint Production Agreement he signed as a condition of operating as a member of a team with Konrad during his employment with Smith Barney and by soliciting clients subject to the Joint Production Agreement.

54.     Oblon breached his obligations to Smith Barney and Konrad under the Joint Production Agreement by using confidential or trade secret information to contact clients subject to the Joint Production Agreement and by soliciting Smith Barney clients assigned to Konrad.

- 13 -

148254v4

55.     Smith Barney has performed all of its duties and satisfied all of its obligations under the Joint Production Agreement.

56.     Smith Barney has been damaged as a result of Oblon's ongoing breaches of his contractual duties.  Smith Barney has suffered irreparable harm as a result of Oblon's conduct and will continue to suffer irreparable harm unless he is enjoined from engaging in any such further conduct.

**COUNT III**
**MISAPPROPRIATION OF TRADE SECRETS**

57.     Smith Barney repeats and realleges the foregoing paragraphs as if fully set forth herein.

58.     Smith Barney's client information, including, but not limited to, the names, addresses, social security numbers, account types and names, objectives, trade histories, and other financial information of its clients, are Smith Barney's confidential and proprietary business records and constitute trade secrets under Illinois law.

59.     Oblon has wrongfully taken Smith Barney's confidential client information, including its Client Profiles.  Client Profiles typically contain client names, addresses, phone numbers, e-mail addresses, social security numbers, account types and numbers, investment history and asset allocation.  The confidential and proprietary customer information misappropriated from Smith Barney by Oblon has actual or potential independent economic value from not being generally known to the public or other persons who can obtain economic value from their disclosure or use.

60.     Smith Barney has taken more than adequate measures to maintain the secrecy and confidentiality of its confidential and trade secret information, including but not limited to, (a) requiring Oblon and other employees to sign an employment agreement containing

- 14 -

confidentiality provisions as a condition of their employment with Smith Barney; (b) maintaining such information in secured hard copy files and/or pass-code protected computer files; and (c) limiting access to such information on a need-to-know basis.

61.     Oblon has used and will continue to use Smith Barney's trade secrets in order to solicit Smith Barney's customers and accounts, and to divert their business from Smith Barney to Wachovia, a direct competitor of Smith Barney.

62.     By removing Smith Barney's confidential and proprietary customer information and also by using such information to his own advantage and against the interests of Smith Barney, Oblon has violated his contract with Smith Barney and the Illinois Trade Secrets Act.

63.     Oblon's actions constitute actual and threatened misappropriation of trade secrets in violation of Illinois Trade Secrets Act, 765 ILCS 1065/1, *et. seq.*

64.     Smith Barney has been damaged as a result of Oblon's conduct.  Smith Barney has suffered irreparable harm as a result of Oblon's conduct and will continue to suffer irreparable harm unless Oblon is enjoined from engaging in any such further conduct.

**WHEREFORE**, Smith Barney respectfully requests that this Court issue an Order:

(a)     enjoining Oblon, and all others acting in concert with him, from:

(i)     destroying any of the records and/or information that Oblon removed from Smith Barney;

(ii)     using, disclosing, or transmitting for any purpose – including the initiation of any contact with or the solicitation of Smith Barney clients – the information contained in the records of Smith Barney,

- 15 -

including, but not limited to, the personal and financial information of said clients;

(iii)  using Smith Barney's client information to contact or solicit customers assigned to other brokers; and

(iv)  initiating any further contact or communication with, including soliciting any business from, customers whom Oblon had contact with or whose name became known to him while in the employ of Smith Barney (except those customers he identified at the time of his resignation letter);

(b)  ordering Oblon to immediately return to counsel for Smith Barney all original records and copies and/or other reproductions thereof, and/or any other documents containing information derived from those records, in whatever form, including electronic or computerized versions (including diskettes thereof); and

(c)  granting such other relief as this Court deems just and appropriate.

Dated:  April 16, 2008                              Respectfully submitted,

                                                 CITIGROUP GLOBAL MARKETS INC.,
                                                 d/b/a SMITH BARNEY,


                                                 By: ____/s/ Gary M. Miller_____
                                                        One of Its Attorneys


Gary M. Miller
Daniel M. Hinkle
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL  60606
(312) 704-7700

148254v4

## VERIFICATION

Under penalties of perjury under the laws of the United States, the undersigned certifies that the statements set forth in the foregoing Verified Complaint for Injunctive Relief are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated:  April /6, 2008

By:_____
Phillip Hall
Smith Barney Branch Manager,
Naperville, Illinois

APR 16 '08 PM 12:30

- 17 -

148254v4

TOTAL P.02

08CV2175          TC
JUDGE KENNELLY
MAGISTRATE JUDGE COLE

# EXHIBIT A

# SALOMON SMITH BARNEY

**PROMISSORY NOTE**
**FORGIVABLE LOAN AGREEMENT**

A Member of TravelersGroup

**(A)** Paul James Oblon

**(B) Amount of Loan (Principal Sum)** $348,232.00

In consideration of a loan from Salomon Smith Barney Inc. (the "Lender"), receipt of which is hereby acknowledged, the undersigned whose name appears in Item "A" above (the "Borrower") hereby promises to pay the Lender the principal sum indicated in Item "B" above.

The Borrower hereby agrees to the following terms and conditions:

**1. Payment.** The principal sum shall be payable to the Lender on an annual basis in five equal payments, commencing on the first anniversary of the date on which the Borrower executes this Promissory Note/Forgivable Loan Agreement as indicated below. For the length of time that the Borrower is placed on an approved leave of absence, the Borrower's anniversary date shall be extended by the length of the leave of absence.

**2. Indemnification.** The Borrower promises to pay and indemnify the Lender, for all expenses incurred, including attorney's fees, in connection with the collection of any amount due under this Promissory Note/Forgivable Loan Agreement (the "Note") or to enforce any provision hereunder. The amount the Borrower may be liable for under this paragraph shall be the greater of the actual expenses incurred by the Lender or 15% of the unpaid balance of the Note at the time any proceedings are instituted for collection.

**3. Default.** In the event that the Borrower resigns from the employ of the Lender, or any subsidiary or affiliate thereof, or is terminated for any or no reason, any outstanding balance due hereunder will become immediately due and payable, together with interest accruing from the date of termination at the rate of ten percent (10%) per annum. In addition, the Borrower shall be deemed to be in default hereunder if the Borrower is adjudicated a bankrupt, makes an assignment for the benefit of creditors or files a petition for relief under the bankruptcy laws.

**4. Notices.** The Borrower, his heirs, successors assigns and personal representatives hereby waive presentment, demand for payment, notice of dishonor or protest and any and all other notices and demands in connection with the delivery, performance, default or enforcement of this Note.

**5. Deductions.** The Lender shall have the right, upon default, without notice, to withhold any monies payable by it to the Borrower, as commissions or otherwise or from any amounts payable under any non-qualified deferred compensation or similar arrangement sponsored by the Lender, and to withhold other monies, securities, commodities or other properties of the Borrower which may at any time be in the possession of the Lender for any purpose; and to apply such monies, etc., to satisfy the indebtedness due under this Note. The Borrower hereby authorizes and consents to the aforementioned deductions.

**6. Forgiveness.** Notwithstanding the foregoing, should the undersigned be employed as a full time employee of the Lender on the date that each annual payment is due, the payment due as of that date shall be forgiven.

**7. Governing Law.** This Note and the Loan evidenced thereby shall be governed by the laws of the State of New York.

**8. Remedies.** Subject to Paragraph fifteen (15), the Borrower hereby agrees that any controversy arising out of or relating to this Note, or a default hereunder, shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations of the New York Stock Exchange or the National Association of Securities Dealers.

**9. Successors.** This Note shall inure to the benefit of the Lender, its affiliates, and any successor in interest to the business of the Lender, whether through merger, acquisition, sale or other transfer.

**10. Policies.** The Borrower will at all times comply with the Lender's internal policies and procedures, as well as state and federal securities laws, and the rules of the various exchanges and other regulatory bodies to which the Borrower and Lender are subject.

**11. Registrations/Representations.** The Borrower understands and agrees that the Lender's offer of employment and this Loan are expressly conditioned upon the Borrower's prompt registration with all applicable regulatory bodies and the accuracy of all information which the Borrower has provided including that relating to the Borrower's historical commission production and regulatory and disciplinary background.

**12. At-Will.** This Agreement is not a contract of employment for any period of time. The Borrower's employment with the Lender is on an at-will basis and nothing herein shall be construed as a contract of employment for a definite term.

**13. Confidentiality of Records/Non Solicit.** Borrower understands that any client record and information, including names, addresses, telephone numbers and account information, whether generated by the Lender or Borrower, are confidential and proprietary information and important business assets of the Lender. This information is extremely valuable to the Lender, is not generally known outside of the Lender, is unique and cannot be easily duplicated or acquired. Borrower agrees to use such information only in the normal course of Lender's business and will not remove any client-related records from Lender's premises, whether in original or copied form. Borrower further agrees that for a period of one year following Borrower's termination of employment from the Lender, for any or no reason, Borrower will not solicit, contact, accept or do business with any clients that Borrower learned of during employment with the Lender, other than those clients which Borrower may have brought with Borrower and for whom the Borrower was the broker of record at Borrower's prior employer. In addition, should Borrower's employment terminate for any or no reason prior to the expiration of the Note, then the Borrower agrees not to solicit, contact, accept or do business with any client the Borrower learned of during Borrower's employment for the remaining term of the Note. In the event Borrower breaches any part of this paragraph, the Borrower agrees that the Lender will be entitled to injunctive relief. The Borrower recognizes that the Lender will suffer immediate and irreparable harm and that money damages will not be sufficient to compensate the Lender or to protect the status quo.

**14. Modifications.** The Borrower acknowledges that this Note contains the entire agreement with respect to the Loan and the repayment thereof, and the Borrower is not relying on any other statements, representations or provisions not contained herein. This Note may not be altered or modified in any way unless it is in writing and signed by the parties hereto.

**15. Judgment.** The Borrower authorizes the entry of a Judgment by Confession in favor of Lender for any principal amount of this Note then outstanding after a default of any kind in the payment of this Note. If Lender elects not to enter or cannot enter or enforce the Judgment by Confession, Lender then agrees to submit any claim under this Note to arbitration in accordance with the arbitration provisions herein.

**16. Jurisdiction.** The Borrower consents to the jurisdiction of the courts of the State of New York for the purpose of: (a) entering the Borrower's Affidavit Confessing Judgment and the Judgment confessed thereon; (b) any action to compel arbitration in accordance with the terms of this Note; or (c) confirming or entering judgment upon any arbitration award.

**17. Acknowledgments.** The Borrower hereby acknowledges that the forgiveness provided for in Paragraph 6 is taxable as gross income to the Borrower and as such the **Borrower agrees to promptly reimburse and pay the Lender for all tax withholdings and other requisite deductions required to be made by the Lender.** The Borrower further acknowledges that the loan evidenced by this Note is interest-free for as long as the Borrower is employed by the Lender and as such the Lender is required to annually report to the tax authorities the value of this benefit as income to the Borrower.

---

**TO BE SIGNED IN THE PRESENCE OF A NOTARY PUBLIC**

Signature of the Borrower
x Paul J Oblon

**Date** 9-15-99

Social Security Number 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

Branch Name Naperville

Branch Number 21A

State of Illinois } ss
County of Dupage

Subscribed and sworn to before me on September 15, 1999    Mary E. Currie

"OFFICIAL SEAL" Notary Public
MARY E. CURRIE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/21/2002

5193 (9/98)

# EXHIBIT B

# JOINT PRODUCTION AGREEMENT

AGREEMENT dated __5/13/05__ (the "Agreement")

between __EDWARD KONRAD__ residing at __580 CASEY CT AURORA, IL.__

and __PAUL OBLON__ residing at __1533 SARANEZI AVE NAPERVILLE IL__

and Citigroup Global Markets Inc. ("SB"), a New York corporation with its principal place of business located at 388 Greenwich Street, New York, New York 10013 (collectively referred to as the "parties").

**WITNESSETH:**

WHEREAS, __EDWARD KONRAD__ is employed by SB as a __VICE PRESIDENT- INVESTMENTS__

and __PAUL OBLON__ is employed by SB as a __[STUP- INVESTMENTS__

(hereinafter referred to as the "Producers"),

**A) WHEREAS,** the parties to this agreement desire to set forth their understanding regarding the forming of a joint production agreement between the Producers and to the Producers' sharing of certain accounts, net commissions, payments and expenses ("the Joint Number") that will comprise either the Producers' joint production agreement or the Producers' Specialist Program partnership, according to the terms and conditions set forth herein.

☐ **If this Agreement applies to the Specialist Program check here and complete Section B.**

**B) WHEREAS,** the Producers are currently employed with SB as Financial Consultants, and are participants in the Corporate Client Group's Specialist Program (the "Specialist Program"), and _____ is a Specialist in the Program. The parties to this agreement desire to set forth their understanding regarding the Producers' sharing of certain stock plan accounts ("Plan Accounts") and related net commissions, payments and expenses ("the Joint Number") that will comprise the Producers' Specialist Program partnership according to the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration for the mutual covenants and promises set forth herein, the parties agree as follows:

**I.    THE JOINT ACCOUNT**

(a)    Each Producer shall provide SB with a list of all accounts/households or Plan Accounts that are to be included in the Joint Number and the list shall designate which Producer provided the account to the Joint Number. Said list, which is subject to modification and approval by SB, is attached to this Agreement as Exhibit A and made a part of this Agreement.

(b)    It is the responsibility of each Producer to continuously amend Exhibit A to reflect all accounts/households or Plan Accounts that he or she introduced to the partnership and are to be included in the Joint Number after the execution of this Agreement.

**II.    GROSS PRODUCTION**

Subject to the provisions of this Agreement, the parties agree that gross production, net commissions and payments shall be paid and/or allocated by SB from the Joint Number as follows:

(a) The Producers will share all gross production generated in the Joint Number pursuant to the following percentages:

| Date | Producer __21A - 002__ | | Producer/Specialist | |
|---|---|---|---|---|
| __075__ | __90__ | % | | % |
| __001__ | __10__ | % | | % |

**AND (Specialist Program Only)**

At their option, the Producers may elect to share expenses and payments generated in the Joint Number pursuant to the following percentages:

| Producer | | Producer/Specialist | |
|---|---|---|---|
| | % | | % |

(b)    Unless specifically excluded in writing, signed by each Producer, all new accounts/households or Plan Accounts opened by each Producer will be assigned by SB to the Joint Number, and shall be subject to the terms and conditions of this section.

(c)    For purposes of determining firm funded deferred compensation, bonuses, SB's normal grid payout and all recognition clubs, trips and/or awards, the Producer's individual production based upon the allocations set forth in sub-paragraph (a) of this section shall be the basis for determining eligibility. The combined production of the partnership is not to be considered.

**III.    TERMINATION OF AGREEMENT**

(a)    The Producers shall have the right to terminate this Agreement for any reason or for no reason upon thirty (30) days prior written notice to SB.

(b)    SB shall have the right to terminate this Agreement for any reason or for no reason upon written notice to the Producers.

(c)    The parties to this Agreement acknowledge and agree that the terms and conditions of sections II, IV, V, VI, VII, VIII and XIII survive the termination of this Agreement.

(d)    In the event this Agreement is terminated by any of the parties and the Producers are still employed by SB at the time of the termination of this Agreement, then the accounts/households or Plan Accounts comprising the Joint Number shall be reassigned to the Producer designated for each account/household or Plan Account as set forth in Exhibit A attached hereto; or in accordance with the rules of the Specialist Program in effect at the time of the termination;

(i)    With respect to all accounts and/or households that are a part of the Joint Number but not set forth on Exhibit A, the Producers must notify their Branch Office Manager in writing, within five (5) days of such termination as to which Producer shall service such account and/or household following the termination of this Agreement.

(ii)    In the event that any account in the Joint Number shall be in dispute at the termination of this Agreement, the Producers acknowledge and agree that the Regional Director responsible for their branch shall make the final binding determination as to which Producer shall service said account and/or household following the termination of this Agreement.

(e)    In the event any of the Producers' employment with SB is terminated during the term of this Agreement for any reason, or no reason whatsoever, then this Agreement shall be deemed terminated and the accounts and/or households of the terminated Producer as set forth in Exhibit A shall be re-assigned by the Branch Office Manager in his/her sole discretion.

(f)    In the event of the death or disability of any Producer who is a party to this Agreement, then this Agreement shall be deemed terminated effective the last day of the month in which the death/disability occurs, and the accounts and/or households of the Producer who died or has become disabled as set forth in Exhibit A shall be re-assigned by the Branch Office Manager in his/her sole discretion. Disability, for the purposes of this Agreement, will be defined as commencing as of the date the Producer, after completing Short Term Disability, becomes eligible to apply for Long Term Disability under SB's Long Term Disability Policy in effect at that time.

(g) In the event any of the Producer's employment with SB terminates by reason of retirement as defined in the Citigroup Pension Plan and the retiring Producer has entered into the Franchise Protection Plan ("FPP"), then this Agreement shall be deemed terminated and the accounts and/or households of the retiring Producer as set forth in Exhibit A shall be distributed pursuant to the FPP.

**IV.    ADHERENCE TO SB POLICIES**

Notwithstanding any provision in this Agreement, the Producers acknowledge, understand and agree that the ultimate decision as to whether any Producer can service an account/household or Plan Account and any arrangement as to the sharing of net commissions, expenses, payments and/or income derived from said account lies solely with SB.

**V.    CONFIDENTIAL INFORMATION**

The Producers recognize and agree that all records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained herein, including names, addresses, telephone numbers, and financial information ("Information") of any account/household or Plan Account brought to the Joint Number by the other Producer, whether or not actually designated on Exhibit A, is confidential and the sole and exclusive property of SB and that other Producer. This information is not generally known outside SB and is confidential and used only on a "need to know" basis. Further, this information is unique and cannot be

5640 (11/2004)

Smith Barney is a division and service mark of Citigroup Global Markets Inc.

easily duplicated or acquired. Consequently, the Producers will not use this information or remove any such records from any SB office except for the sole purpose of conducting business on behalf of SB. The Producers agree not to divulge or disclose this information to any third party either during their employment or at any time thereafter.

## VI. COVENANT NOT TO SOLICIT

If, at any time, any of the Producers who are a party to this Agreement resigns from SB, provokes his/her termination, or is terminated for cause, that Producer agrees that for a period of one year following their termination they will not solicit by mail, by telephone, by personal meeting, or by any other means, either directly or indirectly, any account/household or Plan Account brought or introduced to the Joint Number by the other Producer, whether or not actually designated on Exhibit A. This agreement "not to solicit" means that the Producer will not, during their employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever for the purpose of inviting, encouraging or requesting any such account/account/household or Plan Account:

(a) to transfer from SB to them or to their new employer, or

(b) to open a new account with them or with their new employer, or

(c) to otherwise discontinue such account's/household's or Plan Account's patronage and business relationship with SB or the other Producer.

## VII. BREACH OF COVENANTS

In the event any of the Producers who are a party to this Agreement breaches any of the covenants of Sections V and VI, that Producer agrees that SB and/or the non-breaching Producer will be entitled to injunctive relief. The Producers recognize that SB and/or the non-breaching Producer will suffer immediate and irreparable harm and that money damages will not be adequate to compensate SB and/or the non-breaching Producer or to protect and preserve the status quo. Therefore, THE PRODUCERS CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER, or A PRELIMINARY or PERMANENT INJUNCTION ordering:

(a) that they immediately return to SB or to the non-breaching Producer all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever relating to accounts/households or Plan Accounts designated in Exhibit A and/or brought to the Joint Number by another Producer, and that they be enjoined and restrained from using or disclosing any information contained in such records; and

(b) that, for a period of one (1) year, they be enjoined and restrained from soliciting any account/household or Plan Account designated in Exhibit A and/or brought or introduced to the Joint Number by another Producer, and

(c) that they be further enjoined and restrained, for a period of one (1) year, from accepting business from any account/household or Plan Account designated in Exhibit A and/or brought or introduced to the Joint Number by another Producer who was solicited in violation of Section VI or whose records and information was used in violation of Section V.

## VIII. JURISDICTION

For the purposes of Section VII, the Producers agree to submit to, and confer jurisdiction on, the United States District Court or the State Court which has original jurisdiction for the judicial district or county in which they last worked for SB. This Agreement shall be construed, governed by, and enforced in accordance with the laws of said jurisdiction.

After issuance of a TEMPORARY RESTRAINING ORDER or a PRELIMINARY or PERMANENT INJUNCTION, the Producers agree to submit any underlying claim pertaining to this Agreement or the termination thereof to arbitration in accordance with the applicable industry rules and regulations.

## IX. EMPLOYMENT-AT-WILL

The Producers acknowledge, understand and agree that the employment relationship between them and SB is "at will" which affords any party to this Agreement the right to terminate the employment relationship at any time for any or no reason not otherwise prohibited by applicable law. The Producers expressly agree and acknowledge that this Agreement is not an employment contract or an agreement to employ them for a specified period of time or a promise of continued employment with SB for any period of time whatsoever.

## X. NON-WAIVER

The Producers understand that SB may at various times decide not to enforce all or part of this Agreement or similar Agreements with other SB Producers. The Producers agree that such instances of non-enforcement shall not constitute a waiver, and will not prevent SB from enforcing any or all of the remaining portions of this Agreement against the Producers.

## XI. NON-ASSIGNABILITY

Neither this Agreement nor any right, duty, obligation or interest hereunder shall be assignable or delegable by the Producers.

## XII. AMENDMENTS

This Agreement may be amended, modified, superseded or canceled, and the terms or covenants hereof may be waived, only by a written instrument executed by each of the parties hereto, or in the case of a waiver, by the party waiving compliance.

## XIII. MISCELLANEOUS

A. The Producers will at all times comply with SB's internal policies and procedures as well as state and federal securities laws, and the rules of the various exchanges and other regulatory bodies to which SB and they are subject.

B. Nothing in this Agreement is intended to conflict with or violate applicable law. Any interpretation of provisions of this Agreement shall be limited, if necessary, to give legal effect to such terms by such applicable law.

C. If any provision of this Agreement or part thereof is held to be illegal, invalid or unenforceable under present and/or future laws in effect during the term thereof, such provision or part thereof shall be fully severable from this Agreement and shall not affect, impair or invalidate the remainder of this Agreement which shall remain in full force and effect.

D. The captions of the various sections of this Agreement are for convenience and organization only, and are not intended to be a part of the body of this Agreement, nor are they intended to be referred to in construing the provisions of this Agreement.

E. This Agreement supersedes, revokes and/or cancels any and all previous Joint Production Agreements between the parties.

Each Producer whose signature is contained below acknowledges that he/she (i) has read and received this Agreement in its entirety, (ii) was given an opportunity to ask SB questions about it, and, (iii) fully understands the terms of this document and knowingly and freely agrees to abide by them.

Dated: _5 - 13 - 05_

Producer: _Edw J Keur_

Dated: _5/13/05_

Producer/Specialist: _Paul Oblon_

CITIGROUP GLOBAL MARKETS INC.

Dated: _5 (13)_

Branch Manager: _____

For Specialist Program, Regional Director approval is required.

Dated: _____

Regional Director: _____

Smith Barney is a division and service mark of Citigroup Global Markets Inc.

**BRANCH MUST KEEP SIGNED ORIGINAL AND SUBMIT A COPY OF THIS AGREEMENT TO FC COMPENSATION**

# EXHIBIT C

April 10, 2008

Phillip Hall, Branch Manager
SMITH BARNEY
535 Diehl Road, Suite 150
Naperville, IL  60563-7783

Dear Mr. Hall:

On or about January 23, 2008, I met with P ul Oblon to discuss my Smith Barney FMA account and the possible transfer
of other retirement accounts                                            to Smith Barney.

During this
meeting Paul informed me that he was conc ned with the "status" of Smith Barney and, therefore, making a move to
Wachovia Securities. He said I would be he ring from someone from Smith Barney regarding my account, but he highly
recommended that I let him continue to man ge the account.

.  He tried to assure me that he could make me a lot of money once he left Smith Barney,

On Friday, March 14th I received a phone ca l from Smith Barney informing me that Paul had resigned.  The following
Monday, March 17th I phoned to voice my c mplaint.

If you have any questions, please feel free tc contact me at

Sincerely.

APR11'08 AM10:36

Highly Confidential        Redacted for Client
                                             Confidentiality

# EXHIBIT D

March 14, 2008


Phil Hall, Branch Manager-Smith Barney
535 E. Diehl Rd, Suite 150
Naperville, IL  60563


Dear Phil,

This letter will serve as notice of my formal resignation as Financial Advisor
with Smith Barney, effective immediately.

After today, I may be reached at Wachovia Securities, 55 Shuman Blvd,
Naperville, IL  60563, phone 630-548-6150.

I am leaving all client documents and files in a neat and orderly condition as
they were used while I was employed by Smith Barney.


Sincerely,

Paul Oblon

**Paul Oblon**
First Vice President-Wealth Management
Senior Investment Management Specialist/
Financial Consultant

535 E. Diehl Road, Suite 150
Naperville, IL 60563

Tel  630-799-9878
Fax  630-955-9470
Toll Free  800-965-6083
paul.oblon@smithbarney.com

**citi smith barney**

3/14/08

"ED —

    WITH  THE  NEWS  ON  OUR  PARENT  LATELY,

I  DECIDED  TO  ENTERTAIN  THE  CALLS  I  WAS

RECEIVING  ON  LOOKING  AT  NEW  OPPORTUNITIES.

AFTER  CAREFUL  REVIEW,  I  DECIDED  TO  JOIN

WACHOVIA  SECURITIES.

I  APPRECIATE  THE  OPPORTUNITY  TO  WORK  WITH

YOU.  I  WISH  YOU  ALL  THE  BEST,  PERSONALLY

AND  PROFESSIONALLY  AND  TO  A  GREAT  RETIREMENT.


REGARDS,

Paul

Citigroup Global Markets Inc.

The information set forth was obtained from sources which we believe reliable but we do not guarantee its accuracy or completeness.
Neither the information nor any opinion expressed constitutes a solicitation by us of the purchase or sale of any securities.

# EXHIBIT E

## PROTOCOL FOR BROKER RECRUITING

The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms  If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding "  The signatories to this protocol agree to implement and adhere to it in good faith

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information  client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information  Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her  The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR  The local branch management will send the information to the firm's back office  In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her

To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose  If a former client indicates to the new firm that he/she would like the prior firm to provide account number(s) and/or account information to the new firm, the former client will be asked to sign a standardized form authorizing the release of the account number(s) and/or account information to the new firm before any such account number(s) or account information are provided

The prior firm will forward to the new firm the client's account number(s) and/or most recent account statement(s) or information concerning the account's current positions within one business day, if possible, but, in any event, within two business days, of its receipt of the signed authorization  This information will be transmitted electronically or by fax, and the requests will be processed by the central back office rather than the branch where the RR was employed  A client who wants to transfer his/her account need only sign an ACAT form

WI850873v1

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

The RR's former firm is required to preserve the documents associated with each account as required by SEC regulations or firm record retention requirements.

It shall not be a violation of this protocol for an RR, prior to his or her resignation, to provide another firm with information related to the RR's business, other than account statements, so long as that information does not reveal client identity.

Accounts subject to a services agreement for stock benefits management services between the firm and the company sponsoring the stock benefit plan that the account holder participates in (such as with stock option programs) would still be subject to (a) the provisions of that agreement as well as to (b) the provisions of any account servicing agreement between the RR and the firm. Also, accounts subject to a participation agreement in connection with prospecting IRA rollover business would still be subject to the provisions of that agreement.

If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit. In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients.

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving. (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations, (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership.

If accounts serviced by the departing RR were transferred to the departing RR pursuant to a retirement program that pays a retiring RR trailing commissions on the accounts in return for certain assistance provided by the retiring RR prior to his or her retirement in transitioning the accounts to the departing RR, the departing RR's ability to take Client Information related to those accounts and the departing RR's right to solicit those ac-

- 2 -

counts shall be governed by the terms of the contract between the retiring RR, the departing RR, and the firm with which both were affiliated

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto   A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory   The protocol will remain in full force and effect with respect to those signatories who have not withdrawn

Citigroup Global Markets Inc  ("Smith Barney")

By _____

Name    Kevin McManus
Title     Managing Director and Chief
          Administrative Officer, Private
          Client Branch System


Merrill Lynch, Pierce, Fenner & Smith Incorporated

By _____

Name    Phil Sieg
Title     Managing Director, Head of Strategic
          Leadership and Development


UBS Financial Services Inc.

By _____

Name    Barry Buchsbaum
Title     Director of Strategic Development
          Executive Vice President

- 3 -

<u>JOINDER AGREEMENT FOR BROKER PROTOCOL</u>

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under the Protocol for Broker Recruiting

Dated as of the 10 day of January, 2006

WACHOVIA SECURITIES LLC

By
Name: ELLERY Y WALKER, III. "CHIP"
Title: MANAGING DIRECTOR, FA INTEGRATION

W2804357v1