**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITIGROUP GLOBAL MARKETS INC., d/b/a | ) | |
| SMITH BARNEY | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 08-C-2175 |
| PAUL OBLON, | ) | |
| Defendant. | ) | Judge Matthew F. Kennelly |
| | ) | |
| | ) | Magistrate Judge Cole |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Gary M. Miller
Daniel M. Hinkle
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL  60606
(312) 704-7700

*Attorneys for Plaintiff*

148585v4

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

FACTUAL BACKGROUND ................................................................................................... 1

    A.  Oblon's Agreements With Smith Barney ...................................................................... 2

        1.     The Loan Agreement. ............................................................................ 2

        2.     The Joint Production Agreement. ........................................................... 3

        3.     The Protocol For Broker Recruiting ....................................................... 3

    B.  Smith Barney's Clients and Goodwill........................................................................... 4

    C.  Oblon's Breaches Of His Contractual Obligations And Misappropriation Of Trade
        Secrets.......................................................................................................................... 5

ARGUMENT ........................................................................................................................... 6

I.     Smith Barney is Entitled to Injunctive Relief................................................................. 6

    A.  Smith Barney Has A High Likelihood of Success on the Merits. ............................... 7

        1.     Smith Barney is likely to prevail on its claims for breach of contract
             (Counts I and II) .................................................................................... 8

        2.     Oblon Misappropriated Smith Barney's Confidential Information And
             Trade Secrets. ...................................................................................... 11

    B.  Smith Barney Has No Adequate Remedy at Law And Will Suffer Irreparable
        Harm Absent An Injunction.......................................................................................... 13

    C.  Granting Injunctive Relief Outweighs Denial And Serves The Public Interest. ........ 14

CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

## Cases

*A.B. Dick Co. v. American Pro-Tech*,
514 N.E.2d 45, 49 (Ill. App. Ct. 1987) ................................................................. 10

*Abbott-Interfast Corp. v. Harkabus*,
619 N.E.2d 1337 (Ill. App. Ct. 1993) ................................................................... 11

*Adams v. Attorney Registration and Disciplinary Comm'n of Supreme Court*, 801 F.2d
968 (7th Cir. 1986) ................................................................................................... 6

*Alexander & Alexander Benefits Servs., Inc. v. Benefit Brokers & Consultants, Inc.*,
756 F. Supp. 1408 (D. Or. 1991) .......................................................................... 13

*Arpac Corp. v. Murray*,
589 N.E.2d 640 (Ill. App. Ct. 1992). .................................................................... 11

*Brown v. Brown, Inc. v. Ali*,
494 F. Supp. 2d 943  (N.D. Ill. 2007) ................................................................... 15

*Brunswick Corp. v. Jones*,
784 F.2d 271 (7th Cir. 1986) ............................................................................... 6, 7

*Dam, Snell and Taveirne, Ltd. v. Verchota*,
54 N.E.2d 464 (Ill. App. Ct. 2001) ......................................................................... 8

*Ecolab Inc. v. Paolo*,
753 F. Supp. 1100 (E.D.N.Y. 1991) ........................................................................ 9

*Elmer Miller, Inc. v. Landis*,
625 N.E.2d 338 (Ill. App. Ct. 1993) ..................................................................... 12

*Geritrex Corp. v. DermaRite Indus., LLC*,
910 F. Supp. 955 (S.D.N.Y. 1996) .......................................................................... 9

*Greenwich Mills Co v. Barrie House Coffee Co.*,
91 A.D.2d 398 (N.Y. App. Div. 1983) ................................................................... 11

*Gunderman & Gunderman v. Brassill*,
46 A.D.3d 615 (N.Y. App. Ct. 2007) ....................................................................... 9

*IDS Fin. Services, Inc. v. Smithson*,
843 F. Supp 415 (N.D. Ill. 1994) ..................................................................... 12, 13

*IDS Life Ins. Co. v. SunAmerica, Inc.*,
958 F. Supp. 1258 (N.D. Ill. 1997) *aff'd in relevant part*, 136 F.3d 537 (7th Cir.
1998) ............................................................................................................. 7, 12, 13

*JAK Productions, Inc. v. Wiza*,
986 F.2d 1080 (7th Cir. 1993) ................................................................................. 8

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
323 F. Supp. 2d 525 (S.D.N.Y. 2004) ..................................................................... 9

148585v4

*Leo Silfen, Inc. v. Cream*,
   29 N.Y.2d 387 (N.Y. 1972) ........................................................................................ 10

*MAI Systems Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993)..................................................................................... 13

*Mantek v. Share Corp.*,
   780 F.2d 702 (7th Cir. 1986)....................................................................................... 8

*McRand, Inc. v. Van Beelen*,
   486 N.E.2d 1306 (Ill. App. Ct. 1985) ....................................................................... 10

*Merrill Lynch v. Dunn*,
   191 F. Supp. 2d 1346 (M.D.Fla. 2002).........................................................................9

*Merrill Lynch v. Hagerty*,
   808 F. Supp. 1555 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993) ................ 12

*Merrill Lynch v. Kramer*,
   816 F. Supp. 1242 (N.D. Ohio 1992) ........................................................................ 12

*Merrill Lynch v. Patinkin*,
   91 C. 2324, 1991 WL 83163 (N.D. Ill. May 9, 1991) ................................................. 8

*Merrill Lynch v. Salvano*, 999 F.2d 211 (7th Cir. 1993) ........................................... 7, 13

*Panther Sys. II, Ltd. v. Panther Computer Sys., Inc.*,
   783 F. Supp. 53 (E.D.N.Y. 1991)............................................................................... 11

*PCx Corp. v. Ross*,
   522 N.E.2d 1333 (Ill. App. Ct. 1988) ...................................................................... 8, 9

*Ruscitto v. Merrill Lynch*,
   777 F. Supp. 1349 (N.D. Tex. 1991) ......................................................................... 14

*Seidman v. Hirshberg*,
   712 N.E.2d 1220 (N.Y. 1999) ..................................................................................... 9

*Siemens Bldg. Techs., Inc. v. Camacho*,
   168 F. Supp. 2d 425 (E.D. Pa. 2001)........................................................................... 8

*Stampede Tool Warehouse, Inc. v. May*,
   651 N.E.2d 209 (Ill. App. Ct. 1995)..................................................................... 12, 13

*Tower Oil and Technology Co., Inc. v. Buckley*,
   425 N.E.2d 1060 (Ill. App. Ct. 1981) ....................................................................... 10

*Unisource Worldwide, Inc. v. Valenti*,
   196 F. Supp. 2d 269 (E.D.N.Y. 2002) ...................................................................... 11

**Statutes**

ILCS..................................................................................................................................... 12

Illinois Uniform Trade Secrets, 765 ILCS 1065 .................................................................. 11

**Rules**

Fed. R. Civ. Proc. 65 ............................................................................................................. 6

Rule 13804 of FINRA's Code of Arbitration Procedure............................................................ 2

148585v4

Plaintiff Citigroup Global Markets Inc., d/b/a Smith Barney ("Smith Barney"), submits this memorandum in support of its request for a temporary restraining order and preliminary injunction against Defendant Paul J. Oblon ("Oblon").[1]

## FACTUAL BACKGROUND

Oblon worked in Smith Barney's branch office in Naperville, Illinois from September 15, 1999 until March 14, 2008, as a Vice President and financial adviser. Ver. Compl. at ¶1. On March 14, 2008, Oblon resigned and immediately began working for Wachovia Securities, LLC ("Wachovia") in that firm's Naperville, Illinois office. *Id.* Prior to resigning from Smith Barney, while he still owed duties to Smith Barney as an employee and agent, Oblon solicited Smith Barney customers and employees to leave Smith Barney and to go to Wachovia with him. *Id.* at ¶¶1, 3-5. Shortly after Oblon resigned, his assistant at Smith Barney, Sarah Zimmerman ("Zimmerman"), discovered that Oblon had taken several of Smith Barney's client files, which contained confidential client information including the client names, contact information, investment history, account data and asset allocations. Ver. Compl. at ¶4; Zimmerman Aff. at ¶¶6-7.

To date, clients have transferred over $45 million in assets away from Smith Barney and to Wachovia as a result of Oblon's actions. Ver. Compl. at ¶1. Oblon's acts constitute flagrant breaches of the non-solicitation and confidentiality covenants in contracts that Oblon entered into with Smith Barney and also give rise to the right to equitable relief under various statutory and common-law rules of law.

Smith Barney does not seek to prevent Oblon from working for Wachovia. Nor does Smith Barney seek to prevent Oblon from working at Wachovia with clients whom he introduced

---

[1] The facts stated in this Memorandum are drawn from Smith Barney's Verified Complaint and from the Affidavit of Sarah Zimmerman, attached hereto as Exhibit 1, and Edward Konrad, attached hereto as Exhibit 2.

to Smith Barney.  Rather, this is an action to enjoin Oblon from further misappropriating and

exploiting Smith Barney's confidential, proprietary and trade secret information, and from

soliciting and using Smith Barney's confidential information to contact or solicit, Smith

Barney's clients originated and serviced by other Smith Barney brokers.  In accordance with the

plain contractual terms to which Oblon agreed when he became a Smith Barney employee, he

should be immediately enjoined from misappropriating Smith Barney's trade secret information

and from soliciting, or using Smith Barney's client information to contact or solicit, customers

assigned to other brokers.2

### A.    Oblon's Agreements With Smith Barney

#### 1.    The Loan Agreement.

Oblon is bound by a Loan Agreement with Smith Barney (the "Loan Agreement"), which

prohibits him, for a period of 12 months after his termination, from soliciting Smith Barney

customers whom he learned of at Smith Barney and from using or disclosing Smith Barney's

confidential, proprietary and trade secret information for the benefit of any individual or entity

other than Smith Barney.  *See* Ex. A to Ver. Compl. at ¶13.

Oblon expressly agreed that violation of these non-solicitation and confidentiality

covenants would cause irreparable harm to Smith Barney and consented to the entry of an

interim immediate injunction should he violate such covenants.  *Id.*

---

2 Each of the parties is a member person, or a member firm, of the Financial Industry Regulatory
Association ("FINRA"). Ver. Compl at ¶8.  Pursuant to Rule 13804 of FINRA's Code of Arbitration
Procedure, the parties are subject to mandatory arbitration of this dispute before industry panelists.  Smith
Barney seeks injunctive relief only until such time as the arbitrators are impaneled and rule on the merits
of Smith Barney's request.  By industry rule and custom, the arbitration panel will be in place and
schedule a hearing within fifteen days after any injunctive order by this Court is entered.

148585v4

      **2.**      **The Joint Production Agreement.**

In 2005, Oblon was assigned to a team led by senior financial advisor Edward Konrad ("Konrad"). Ver. Comp. at ¶17. Konrad teamed with Oblon because he was contemplating retirement and planned to gradually transition his clients to Oblon. *Id.* Smith Barney, Konrad and Oblon entered into a Joint Production Agreement providing that certain clients would be served by both Oblon and Konrad and that Konrad would receive 90% of the resulting proceeds from Smith Barney and Oblon would receive 10%. Ver. Compl. at ¶17; Ex. B to Ver. Compl., the "Joint Production Agreement." The Joint Production Agreement was designed to protect Konrad's client base in the event Oblon resigned from Smith Barney. *Id.* The Joint Production Agreement, like the Loan Agreement, restricts Oblon from (i) using any of Smith Barney's confidential information other than in the course of performing his job duties and (ii) from soliciting any customer whom he shared with Konrad as a joint client. Ex. B to Ver. Compl., Articles V, "CONFIDENTIAL INFORMATION" and VI, "COVENANT NOT TO SOLICIT." Likewise, the Joint Production Agreement provides for an immediate injunction in the event Oblon breaches the Agreement's non-solicitation covenants. Ex. B to Ver. Compl., Article VII, "BREACH OF COVENANTS." The accounts subject to the Joint Production Agreement were originated by Konrad. Ver. Compl. at 17. These clients were long-term clients of Smith Barney and Konrad. *Id.* Many have been Smith Barney clients for well over ten years. *Id.*

      **3.**      **The Protocol For Broker Recruiting**

Smith Barney, Wachovia and other retail brokerage firms have entered into a Protocol for Broker Recruiting ("Protocol"), which provides that, in certain limited circumstances, a departing broker is not liable for the solicitation of clients of his former employer. *See* Ex. E to Ver. Compl. The Protocol, however, does not apply to this situation. First, the Protocol explicitly states that it does not apply to a departing employee's actions taken prior to leaving his

employer. *Id.* It therefore does not excuse Oblon's solicitation of clients and theft of documents while still a Smith Barney employee. Further, under the Protocol, a departing broker may only solicit clients from his former firm if he takes only certain limited client information and provides a copy of the information he takes to his manager when he leaves. *Id.* at 1. Oblon never provided Smith Barney with a copy of the documents. Ver. Compl. at ¶27. To the contrary, Oblon misrepresented to his former manager at Smith Barney that he had left all client files at Smith Barney. Because Oblon did not comply with the protocol, it does not apply to his actions. Ex. E to Ver. Compl. at 2.

Moreover, the Protocol states that if a team agreement exists, the terms of that team agreement govern over the terms of the Protocol as long as the agreement does not forbid soliciting clients the departing broker brought to the former firm. *Id.* Here, Oblon signed a team agreement forbidding him from taking any confidential information regarding, or soliciting, any of Konrad's clients subject to the Joint Production Agreement. *See* Ex. B to Ver. Compl. Hence, the Protocol does not excuse Oblon's actions regarding Konrad's clients.

### B.    Smith Barney's Clients and Goodwill

Smith Barney's client base and confidential client information are the lifeblood of its business. Ver. Compl. at ¶¶31-32. Smith Barney spends millions of dollars every year on national and local advertising, along with many millions of dollars per year for sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phones, mail, research, literature, seminars, trade and other professional news publications, promotional events, and the retention of experts in various specialties related to its' clients needs. *Id.* Smith Barney invests these resources to maintain its goodwill and grow its client base in the securities industry. *Id.*

- 4 -

In addition to the support and access to potential clients that Smith Barney provided to Oblon, Oblon benefited directly from the goodwill, reputation, and name recognition generated by Smith Barney's investments. *Id.* at ¶33. Smith Barney also provided Oblon with sophisticated financial products to sell to Smith Barney's clients as well as considerable technology and human resources to effectively manage client assets. *Id.* at ¶34.

Smith Barney goes to great lengths to protect its customers, its customer-related information and its trade secrets by taking such actions as requiring employees to sign confidentiality agreements, using security access cards, copy controlled documents and multiple layers of password protections for computer databases which contain such information. *Id.* at ¶41.

### C.    Oblon's Breaches Of His Contractual Obligations And Misappropriation Of Trade Secrets

Prior to Oblon's resignation from Smith Barney, he began his efforts to steal Smith Barney's clients, employees, and confidential information.

Before he resigned, Oblon tried to convince one important Smith Barney client that it was unwise for her to stay at Smith Barney. Ver. Compl. at ¶22, Ex. C. He told her he was leaving Smith Barney because he was concerned about its future and that she should leave Smith Barney and bring her business to Oblon at his new job. *Id.* Also before he resigned, Oblon met with an unusually high number of other clients in a secretive manner, including several closed door meetings and meetings outside of the office. Ver. Compl. at ¶23; Zimmerman Aff. at ¶4. Several important clients contacted Smith Barney extremely quickly after Oblon resigned to transfer their accounts to Oblon at Wachovia. Ver Compl. at ¶23. It is clear that Oblon was also soliciting these clients to leave Smith Barney before he resigned.

Before resigning, Oblon also approached Zimmerman (and possibly other Smith Barney employees), and tried to convince her to leave Smith Barney for Wachovia. Ver. Compl. at ¶24; Zimmerman Aff. at ¶5.

Oblon also stole the files of the largest clients he had worked with at Smith Barney, leaving behind only empty folders. Ver. Compl. at ¶¶25-26; Zimmerman Aff. at ¶¶6-7. The files stolen by Oblon contained Client Profiles and other sensitive account information regarding the largest customers Oblon had worked for, including one client with over $25 million in assets at Smith Barney. Ver. Compl. at ¶¶25-26. These files contained the clients' contact information, net worth, investment history, account data and asset allocations. *Id.*

Oblon also wrongly took confidential client information related to Konrad's clients, which he later used to send out a mass mailing to Konrad's clients regarding Oblon's move to Wachovia. *Id.* at ¶28. Oblon has recently begun to call Konrad's clients to solicit them to come to Wachovia. *Id.* at ¶29.

## ARGUMENT

### I.     Smith Barney is Entitled to Injunctive Relief.

Under well-established standards, Smith Barney is entitled to injunctive relief pursuant to Fed. R. Civ. Proc. 65, because Smith Barney has demonstrated: (1) a reasonable likelihood of success on the merits; (2) that it has no adequate remedy at law and that irreparable harm will result if the injunction is not granted; (3) that greater harm would result to Smith Barney from the denial of injunctive relief than to Oblon if the injunctive relief is granted; and (4) that the public interest would be better served by issuing an injunction. *See Brunswick Corp. v. Jones*, 784 F.2d 271, 273-74 (7th Cir. 1986); *Adams v. Attorney Registration and Disciplinary Comm'n of Supreme Court*, 801 F.2d 968, 971 (7th Cir. 1986).

- 6 -

**A.      Smith Barney Has A High Likelihood of Success on the Merits.**

When seeking a TRO, the petitioner need only demonstrate "some probability" of success. *Brunswick*, 784 F.2d at 274-75. It is sufficient if "the plaintiff's chances are better than negligible." *Id.* Smith Barney more than meets this burden. Smith Barney's right to injunctive relief is set forth in the express language of the Loan Agreement and the Joint Production Agreement that Oblon signed, in which Oblon acknowledged that in the event he breaches the contracts, Smith Barney is entitled to seek immediate injunctive relief and that Oblon "CONSENTS" to the entry of such an injunction. *See* Loan Agreement at ¶13; Joint Production Agreement at Article VII ("BREACH OF THE COVENANTS").

Smith Barney entrusted Oblon with some of its most valuable assets – its clients' goodwill and its confidential client information. Oblon agreed to treat Smith Barney's client information as strictly confidential, and further agreed not to solicit the business of Smith Barney clients within one year of the termination of his employment with Smith Barney.

In direct violation of his contracts with Smith Barney and his fiduciary duties, Oblon has misused Smith Barney's confidential client information to solicit the business of Smith Barney clients. Courts consistently grant injunctive relief to securities firms who have protected their client information with confidentiality agreements and taken reasonable measures to keep such information confidential. For example, in *Merrill Lynch v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993), the Seventh Circuit held that evidence that a departing broker "took various documents and information pertaining to [the former employer's] clients and used that information to solicit [the former employer's] clients" was sufficient to grant a temporary restraining order. *See also IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F. Supp. 1258, 1279 (N.D. Ill. 1997) (granting injunction where former employee stole client lists and client investment records and used them to solicit customers), *aff'd in relevant part*, 136 F.3d 537 (7th Cir. 1998); *Merrill Lynch v.*

*Patinkin*, 91 C. 2324, 1991 WL 83163, at *1-2 (N.D. Ill. May 9, 1991) (granting TRO upon proof that brokers had violated an employment agreement with a one-year non-solicitation term). The same evidence is present here, and the same result should follow.

>    1.    **Smith Barney is likely to prevail on its claims for breach of contract (Counts I and II)**

Illinois courts routinely uphold restrictive covenants that protect an employer's legitimate business interests, which include: (1) the employer's near-permanent client relationships where the employee would not have had contact with such clients "but-for" his association with the employer; and (2) the employer's trade secret and confidential information, where the employee has acquired this information through the course of his employment with the employer and subsequently attempts to use it for his own benefit.  *PCx Corp. v. Ross*, 522 N.E.2d 1333, 1339 (Ill. App. Ct. 1988) (employer entitled to a preliminary injunction prohibiting former employee from soliciting customers); *Mantek v. Share Corp.*, 780 F.2d 702, 710-11 (7th Cir. 1986) (court held that "prohibition against the defendants calling upon customers who they contacted while working for plaintiff" was reasonable); *JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1083-84 (7th Cir. 1993) (holding that contract prohibiting contact with former employer's customers for one year was reasonable); *Dam, Snell and Taverine, Ltd. v. Verchota*, 754 N.E.2d 464, 468-69 (Ill. App. Ct. 2001) (accountant barred from soliciting business of clients she serviced while working at plaintiff employer); *Siemens Bldg. Techs., Inc. v. Camacho*, 168 F. Supp. 2d 425, 427 (E.D. Pa. 2001) (applying Illinois substantive law and holding, "A two year restriction on the solicitation or servicing of the former employer's clients with whom the employee had contact is reasonable.").

Similarly, under New York law,[3] courts will enforce restrictive covenants that protect (1) an employer's goodwill embodied in long-term relationships with clients, even if the employee was involved in generating that goodwill, *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 535 (S.D.N.Y. 2004); *Seidman v. Hirshberg*, 712 N.E.2d 1220, 1224-25 (N.Y. 1999), or (2) an employer's trade secrets or other confidential information. *See Geritrex Corp. v. DermaRite Indus., LLC*, 910 F. Supp. 955, 959 (S.D.N.Y. 1996); *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1112-13 (E.D.N.Y. 1991); *see also Merrill Lynch v. Dunn*, 191 F. Supp. 2d 1346, 1353 (M.D.Fla. 2002) (applying New York law and enforcing non-solicit agreement where former employee was using employer's confidential information).

To determine if a near permanent relationship exists, Illinois courts look to the "amount of time, expense and effort invested by the employer in developing and maintaining its clientele; the amount and frequency of personal contact by the employer with the customers; the extent of the employer's knowledge of the customers' buying habits as well as their current and future business needs and requirements; and the continuity and duration of the business relationships in relation to the length of time the employer has been in business." *PCx*, 552 N.E.2d at 1339-40. New York courts will similarly enforce a non-solicitation agreement that protects an employer's interests in customer goodwill when the employer has expended significant expenses to build that goodwill. *Gunderman & Gunderman v. Brassill*, 46 A.D.3d 615, 615 (N.Y. App. Ct. 2007). Smith Barney's relationship with its clients clearly satisfies this threshold.

Smith Barney spends millions each year developing customer goodwill. Ver. Compl. at ¶¶31-34. Smith Barney clients typically entrust Smith Barney brokers with extremely sensitive financial and personal information. Ver. Compl. at ¶33. Because of this, Smith Barney's

---

[3] The Loan Agreement is subject to New York law. Ex. B to Ver. Compl. at §7. However, Illinois and New York law regarding restrictive covenants do not differ in any way that would affect this motion.

brokers develop close relationships with Smith Barney's clients, which relationships often last for many years. *Id.* Oblon gained personal and frequent access to many of his clients solely through his employment with Smith Barney. Ver. Compl. at ¶¶5, 34. The Konrad clients at issue in the case are long term Smith Barney clients. Ver. Compl. at ¶17. For many of these clients, Konrad has spent over ten years cultivating their goodwill. Ver. Compl. at ¶17. The non-solicitation provisions in the Loan Agreement and the Joint Production Agreement are tailored to protect Smith Barney's interests in its long-term client relationships and are therefore enforceable.

These covenants also protect Smith Barney's confidential client information. In order to serve its clients, Smith Barney must allow its employees access to sensitive client information, including information on the client documents Oblon took from Smith Barney, such as contact information, account data and asset allocation. *Id.* at ¶¶32-34. The non-solicitation covenants in the Loan Agreement and Joint Production Agreement are enforceable because they protect that information, by prohibiting an employee from using the client information he or she accessed while at Smith Barney to direct business to a competitor. *See, e.g.*, *McRand, Inc. v. Van Beelen*, 486 N.E.2d 1306, 1310-11 (Ill. App. Ct. 1985) (restrictive covenants enforceable if reasonable to protect employer's legitimate interests); *Tower Oil and Technology Co., Inc. v. Buckley*, 425 N.E.2d 1060, 1065 (Ill. App. Ct. 1981) (restrictive covenants "protect an employer from the unwarranted erosion of confidential information," which confidential information need not rise to the level of a trade secret to be protectable); *A.B. Dick Co. v. American Pro-Tech*, 514 N.E.2d 45, 49 (Ill. App. Ct. 1987) (confidential information accessible through employment is entitled to the legal protection of a restrictive covenant); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 393 (N.Y. 1972) (confidential customer lists developed at significant cost could be protected by

- 10 -

restrictive covenants and trade secret law); *Panther Sys. II, Ltd. v. Panther Computer Sys., Inc.,* 783 F. Supp. 53, 65-66 (E.D.N.Y. 1991) (non-solicitation clause enforced where ex-employee learned of confidential customer information from employer even if the information was not a trade secret); *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 278-79 (E.D.N.Y. 2002) (finding violation of non-competition and confidentiality agreement where employee took customer list and information).

Contractual covenants, such as those at issue here, which restrict only the *solicitation* of customers, rather than competition *per se*, are subject to a much lower degree of scrutiny than general non-competition agreements. *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1341 (Ill. App. Ct. 1993); *Greenwich Mills Co v. Barrie House Coffee Co.,* 91 A.D.2d 398, 401 (N.Y. App. Div. 1983). Accordingly, covenants that restrict solicitation need not have a geographic scope so long as the covenant protects the employer's interests in its customer relations. *See, e.g., Arpac Corp. v. Murray*, 589 N.E.2d 640, 649 (Ill. App. Ct. 1992).

There is no question that Oblon used Smith Barney's confidential information to solicit Smith Barney's clients. Oblon thus violated the non-solicitation covenants in his Loan and Joint Production Agreements. Smith Barney is, therefore, likely to succeed on its claim for a breach of those covenants.

> ## 2.    Oblon Misappropriated Smith Barney's Confidential Information And Trade Secrets.

Smith Barney is also entitled to immediate injunctive relief under the Illinois Uniform Trade Secrets Act ("the Act"), 765 ILCS 1065/2.

The Act specifically references customer information, defining a trade secret as follows:

[I]nformation, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or <u>list of actual or potential customers</u> or suppliers that:

148585v4

(i)   derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii)   is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* (emphasis added).

Where trade secrets have been misappropriated, or where the threat of misappropriation exists, injunctive relief is the appropriate remedy.  765 ILCS 1065/3 ("Actual or threatened misappropriation may be enjoined"… [and] "the injunction may be continued for an additional reasonable period of time in appropriate circumstances for reasons including, but not limited to an elimination of the commercial advantage that otherwise would be derived from the misappropriation").

In accordance with the Act, Illinois courts hold that customer information is a protectable trade secret when, as is clearly the case here, it has independent economic value from not being generally known, and which is the subject of reasonable attempts to maintain secrecy.  765 ILCS 1065/2(d); *Elmer Miller, Inc. v. Landis*, 625 N.E.2d 338, 341-42 (Ill. App. Ct. 1993); *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995).  Customer information of securities firms, in particular, are trade secrets warranting injunctive protection.  *IDS Fin. Services, Inc. v. Smithson*, 843 F. Supp 415, 418 (N.D. Ill. 1994) (holding that company's confidentiality agreements regarding its customer information demonstrated the importance the employer placed on the information and that it was a trade secret);  *SunAmerica, Inc.*, 958 F. Supp. at 1279 (finding customer information and client investment records were trade secrets).[4]

---

[4]  Other courts have repeatedly held that a financial services firm's customer information constitutes a trade secret entitled to protection by injunctive relief.  *See, e.g., Merrill Lynch v. Kramer*, 816 F. Supp. 1242, 1246 (N.D. Ohio 1992) ("[e]ven absent a specific contractual provision, Merrill Lynch's customer information is entitled to trade secret protection"); *Merrill Lynch v. Hagerty*, 808 F. Supp. 1555, 1558 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993) (brokerage had a legitimate, protectable interest in its

- 12 -

Smith Barney's client information has an independent economic value that is not generally known to its competitors and cannot be easily duplicated by its competitors. Ver. Compl. at ¶59. That is surely the reason that Oblon chose to misappropriate Smith Barney's records. Smith Barney took reasonable measures to protect its trade secret and confidential customer information by requiring its employees to sign confidentiality/non-disclosure agreements, restricting access to confidential information to only those with a business "need to know," protecting access to computerized information with computer passwords, and storing confidential customer records under lock and key in a non-public space. Ver. Compl. at ¶¶41, 60. On such facts, Smith Barney is likely to prevail on its trade secrets claims regarding customer files. *See, e.g., Landis*, 625 N.E.2d at 341-42; *Stampede Tool*, 651 N.E.2d at 216; *Smithson*, 843 F. Supp at 418; *SunAmerica, Inc.*, 958 F. Supp. at 1279.

**B.    Smith Barney Has No Adequate Remedy at Law And Will Suffer Irreparable Harm Absent An Injunction.**

Smith Barney has no adequate remedy at law and will suffer irreparable injury absent an injunction for several reasons. First, with respect to the clients that have been solicited by Oblon to leave Smith Barney in violation of his contracts with Smith Barney, it is impossible to determine with any degree of certainty the production revenue that such clients would have generated in the future. *See Kramer*, 816 F. Supp. at 1247 (holding that no adequate remedy at law where former employee was violating a non-solicit agreement); *Salvano*, 999 F.2d at 215 (same); *SunAmerica*, 958 F. Supp. at 1281 ("The inadequacy of legal remedies and the threat of irreparable harm are inherent in cases such as these when the destruction of customer goodwill and trade secrets are at issue.").

---

customer list, which was a trade secret); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520-22 (9th Cir. 1993) (finding customer databases to be trade secrets); *Alexander & Alexander Benefits Servs., Inc. v. Benefit Brokers & Consultants, Inc.,* 756 F. Supp. 1408, 1414 (D. Or. 1991) (granting injunction where ex-employee took customer information and was soliciting employees).

Second, irreparable harm lies in the fact that Smith Barney clients expect their financial information and other information to be kept confidential. Unauthorized disclosure and use of such confidential information by Oblon will inevitably cause Smith Barney to lose client goodwill, trust and confidence. Such a loss constitutes "irreparable harm" because the nature of the injury – loss of clients' goodwill and future business – makes it difficult, if not impossible, to measure such loss fully. *Kramer*, 816 F. Supp. at 1247 (finding that brokerage suffered irreparable and immeasurable harm where clients would lose faith in brokerage when discovery that client information was stolen by departing employee); *Brassill*, 46 A.D.3d at 615 (loss of goodwill is irreparable harm).

The Court should protect Smith Barney's customer goodwill and confidences and its right to receive business from its customers who are otherwise satisfied with Smith Barney's services by entering the injunctive relief requested herein.

### C.    Granting Injunctive Relief Outweighs Denial And Serves The Public Interest.

The benefit of injunctive relief to Smith Barney far outweighs any detriment to Oblon. An injunction would protect Smith Barney's goodwill, business reputation and relationships, trade secrets, and the contractual confidentiality commitments of its employees. On the other hand, the damage to Oblon from granting the temporary restraining order would be, at the most, minimal. Smith Barney does not seek to stop Oblon from working at Wachovia or engaging in his livelihood. All Smith Barney seeks is to stop Oblon from violating his agreement not to use Smith Barney's confidential information for his own benefit and not to solicit Smith Barney's customers assigned to, and originated by, other brokers. *Ruscitto v. Merrill Lynch*, 777 F. Supp. 1349, 1354 (N.D. Tex. 1991) ("The present record plainly shows that Merrill Lynch's request is reasonable. Ruscitto may continue to compete as a stockbroker in the same locale. He is merely restricted for one year from soliciting clients whom he served or whose names became known to

148585v4

him while employed at Merrill Lynch.").  This will not result in substantial harm to Oblon.

Indeed, Oblon agreed to the entry of such an injunction in his contracts with Smith Barney.

Further, an injunction would promote the public interest by assuring public customers

that their financial information at Smith Barney will remain *private*.  *See, e.g., Kramer*, 816 F.

Supp. at 1248 (holding that "[t]o deny injunctive relief in this case would… jeopardize the

integrity of the securities industry to the detriment of the public interest [and]…would cast doubt

on the integrity of contractual arrangements").  The public interest is also served by requiring

employees who have agreed not to solicit their former employer's customers to honor their

agreements.  *Brown v. Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 955  (N.D. Ill. 2007) ("Courts in

this District have recognized that the public interest is served by enforcing valid contracts.").

Oblon has no equities on his side.  Oblon intentionally breached his agreements and

fiduciary duties, and misappropriated Smith Barney's trade secrets and confidential client

information.  The temporary restraining order sought here would only prohibit him from doing

what he agreed not to do and put him in the position he was in before he resigned from Smith

Barney, pending resolution of this case on the merits by FINRA arbitrators.

## CONCLUSION

For all the foregoing reasons, Smith Barney respectfully requests that the Court grant its

motion for a temporary restraining order and preliminary injunction.

DATED:  April 16, 2006                         Respectfully submitted,

                                               CITIGROUP GLOBAL MARKETS INC.,
                                               d/b/a SMITH BARNEY,

                                               By:     /s/ Gary M. Miller
                                               One of its Attorneys

148585v4

# EXHIBIT 1

## DECLARATION OF SARAH B. ZIMMERMAN

I, Sarah B. Zimmerman, declare as follows:

1.     I am over the age of 21 and am competent to testify. I have personal knowledge of the matters set forth herein.

2.     I have worked full time for Smith Barney since Feb 2005. I currently work as a Registered Client Service Associate ("CSA") in Smith Barney's Naperville, Illinois branch.

3.     Until he resigned the middle of March 2008, I was the CSA assigned to work with Paul Oblon. My responsibilities included client service functions for clients including but not limited to opening accounts, submitting and following up on any account documents, assisting clients with Smith Barney services, answering phones and assisting clients with service requests, and completing unsolicited trades if Paul wasn't available or out of office.

4.     A few weeks before he resigned, I noticed that Mr. Oblon's work habits had changed. He had quite a few client meetings or phone conversations behind closed doors. A few of my co-workers commented on these changes as well.

5.     About two weeks before he resigned, Mr. Oblon told me that he was thinking of leaving Smith Barney and joining one of two firms. He asked if I was interested in leaving with him, and we discussed some details & financial terms of my potential employment at another firm with him. I decided to stay with Smith Barney.

6.     After Mr. Oblon resigned, Smith Barney management assigned his accounts to other financial advisors in the office. These advisors or management have, in a few cases, asked me to get certain client files for them.

7.     While doing this, I discovered that a few client files were missing. For example, the file of the largest client previously serviced by Oblon was empty. Client Profiles which are sometimes part of a clients file contain information needed to open an account for a client, such

as name, address, phone number, social security number, date of birth, name of employer, net worth and investment objectives. While I was working with Paul I made an effort to scan everything to our system versus filing paper, however, files of miscellaneous documents did exist for his clients before and during the time I worked with him. I do not recall the nature of the missing documents.

I swear to the truth of the foregoing under penalties of perjury under the laws of the United States. Executed this 16 day of April, 2008, at Naperville, Illinois.

Sarah B. Zimmerman

2

# EXHIBIT 2

## DECLARATION OF EDWARD KONRAD

I, Edward Konrad, declare as follows:

1.     I am over the age of 21 and am competent to testify.  I have personal knowledge of the matters set forth herein.

2.     I have been employed by Smith Barney for 20 years. I am currently a Vice President of Wealth Management and financial advisor in Smith Barney's Naperville, Illinois branch.

3.     Over the years, I have developed a significant number of clients.  Many of my clients have been with me for 20 years.  On average, my clients have been with me for approximately 10 years.

4.     In May 2005, I entered into a Joint Production Agreement with Paul Oblon, another financial advisor in Smith Barney's Naperville, Illinois branch.  In the Joint Production Agreement, Oblon and I agreed to share the commission revenues on certain clients.  I entered into that agreement because I was contemplating retirement and wanted to start the process of transitioning my clients to another financial advisor, so, when I finally did retire, the clients likely would remain with Smith Barney.  I originated each of the clients subject to the Joint Production Agreement.  Oblon originated none of these clients.  In exchange for giving Oblon a share of the commission revenue from these clients, I expected Oblon to help me manage the client accounts.

5.     After we entered into the Joint Production Agreement, Oblon was given access to Smith Barney's confidential information regarding those clients, including contact information, net worth, financial holdings, trading history and asset allocation.  I understood that, under the Joint Production Agreement, Oblon was to keep this information confidential and only use the information on behalf of Smith Barney.  I also understood that, if Oblon ever left Smith Barney,

148941v1

he would not be allowed to take any of this information and, for a period of one year, would not be allowed to solicit clients subject to the Joint Production Agreement. That was important to me, because I did not want to give Oblon access to my clients only to see him later try to take those clients to another firm.

6.    On Friday, March 14, 2008, I received a voicemail message from the Smith Barney office manager and my assistant, informing me that Oblon had resigned from Smith Barney. I later learned he immediately went to work for Wachovia, in its Naperville, Illinois branch. Oblon had not previously informed me he was planning to leave.

7.    About a week ago, one of my clients, who Oblon had access to under the Joint Production Agreement, informed me that Oblon had sent him the announcement card attached as Ex. A hereto. Earlier this week, another client sent me the same card, which he also received from Oblon.

8.    I have been attempting to contact all of my clients, to reassure them that their accounts will be properly serviced despite Oblon's departure. Every managed account client I have spoken with has told me that he or she received an announcement card like Ex. A hereto. Based on this, it is my belief that Oblon took a list of the managed account clients he had access to under the Joint Production Agreement and sent a mass mailing to them.

9.    Earlier today, one of my clients told me that she received a voice-mail message from Oblon, in which he encouraged her to move her accounts to Wachovia. I am concerned Oblon is also soliciting my other clients by phone or in person.

I swear to the truth of the foregoing under penalties of perjury under the laws of the United States. Executed this 16th day of April, 2008, at Naperville, Illinois.

Edward J. Konrad
4-16-2008

148941v1

2

# EXHIBIT A



WE ARE PLEASED TO
ANNOUNCE THAT

# PAUL J. OBLON

*Senior Vice President – Investments*

HAS JOINED

# WACHOVIA SECURITIES

55 Shuman Boulevard, Suite 750
Naperville, IL 60563
630-548-6171 · 800-778-7517 Toll Free
paul.oblon@wachoviasec.com



*Wachovia Securities, LLC, Member NYSE/SIPC, is a registered
broker-dealer and a separate nonbank affiliate of Wachovia Corporation.*
© 2008 Wachovia Securities, LLC 68585 0308-82047 3/08

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITIGROUP GLOBAL MARKETS INC., d/b/a SMITH BARNEY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| PAUL OBLON, | ) ) | |
| Defendant. | ) ) ) | |

**APPENDIX OF UNPUBLISHED AUTHORITIES IN MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

*Merrill Lynch v. Patinkin*,
    No. 91 C 2324, 1991 WL 83163 (N.D. Ill. May 9, 1991)………………………………..1

Dated:  April 16, 2008                          Respectfully submitted,

                                         CITIGROUP GLOBAL MARKETS INC.,
                                         d/b/a SMITH BARNEY

                                         By:  ___/s/ Gary M. Miller_____
                                               One of Its Attorneys

Gary M. Miller
Daniel M. Hinkle
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL  60606
(312) 704-7700

148930v1

# EXHIBIT 1



Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1991 WL 83163 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1991 WL 83163)**

Merrill Lynch, Pierce, Fenner & Smith, Inc. v.
Patinkin
N.D.Ill.,1991.
Only the Westlaw citation is currently available.
    United States District Court, N.D. Illinois, Eastern
                        Division.
    MERRILL LYNCH, PIERCE, FENNER & SMITH,
                    INC., Plaintiff,
                          v.
            Stuart PATINKIN, Defendant.
                  **No. 91 C 2324.**

                    May 9, 1991.

          *MEMORANDUM OPINION AND ORDER*

ANN C. WILLIAMS, District Judge.
**\*1** This matter is before the court on plaintiff's
Motion to extend the Temporary Restraining Order
issued April 19, 1991, pending an award and final
decision of the arbitration panel of the New York
Stock Exchange, defendant's Motion to Vacate the
Temporary Restraining Order, and defendant's
motion to increase bond set under the temporary
restraining order. Plaintiff's motion to extend the
Temporary Restraining Order is granted. The
Temporary Restraining Order is extended until July
1, 1991. At that time the court will review the status
of the arbitration proceedings, and may extend the
TRO if there is good cause to do so. Defendant's
Motion to Increase Bond Set on the order to $50,000
is granted. Defendant's motion to vacate the
temporary restraining order is denied. Any further
proceedings in this case are stayed pending an award
and final decision of the arbitration panel in
accordance with the Constitution and Rules of the
New York Stock Exchange.

                    *Background*

Plaintiff's verified complaint alleges that Stuart
Patinkin entered Plaintiff's employ on March 15,
1982, pursuant to an Account Executive Trainee
Agreement ("the Agreement"). The Agreement
provides that Merrill Lynch retains exclusive
ownership of its client records and account

information, which are to be kept confidential. The
Agreement also provides that the defendant will not
solicit any of Merrill Lynch's clients for a period of
one year after the termination of his employment
from Merrill Lynch.[FN1]

On April 12, 1991, defendant resigned from his job at
Merrill Lynch, without notice, to work at Prudential
Securities, a securities firm which is competitive with
Merrill Lynch. Indeed, plaintiff claims that the day
after Patinkin left Merrill Lynch, his former Merrill
Lynch customers received letters from Prudential
Securities soliciting their business.[FN2]

Plaintiff alleges that Patinkin took account records
out of the Merrill Lynch office, and that the
defendant used and transmitted information from
these records in order to solicit Merrill Lynch's
customers. On April 19, 1991, plaintiff filed this
action for conversion, breach of fiduciary duty, and
unfair competition. On that same day, plaintiff also
requested immediate injunctive relief, in the form of a
Temporary Restraining Order ("TRO"), prohibiting
the defendant from further breaching the terms of the
Agreement. In response to plaintiff's motion, the
defendant presented a written motion to compel
arbitration, and oral argument on both the motion to
compel arbitration, and in opposition to the TRO.
Defendant Stuart Patinkin was given the opportunity
to testify at oral argument, but declined. Hence, the
TRO was issued after notice was given to the
Defendant, and after the court heard and considered
the motions, oral evidence and other submissions by
both parties.[FN3]

In issuing the TRO the court found that the
Agreement "contain[ed] various restrictions on
Defendant's ability to use Plaintiff's records and
otherwise compete with Plaintiff upon a change in
the Defendant's employment." (TRO, para. 2).
Further, the court also found that the plaintiff had no
adequate remedy at law for the alleged breach of the
Agreement (TRO, para. 3), and that the plaintiff
would suffer irreparable harm and loss if a TRO was
not granted (TRO. para. 4). Finally, the court found
that greater injury would be inflicted upon the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2
Not Reported in F.Supp., 1991 WL 83163 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1991 WL 83163)**

plaintiff by the denial of the TRO than would be inflicted upon the defendant by granting the TRO. (TRO, para. 6).

**\*2** The TRO both enjoined and restrained the defendant from soliciting or accepting business from any client of plaintiff's whom defendant served, or whose name became known to the defendant while in plaintiff's employ.[FN4] Defendant was also enjoined and restrained from accepting any business from any clients whom Defendant solicited for purposes of doing business with Prudential Bache. Finally, defendant was enjoined and restrained from using, disclosing or transmitting information contained in plaintiff's records, including the names and addresses and financial information of plaintiff's clients. Patinkin was ordered to deliver any original records or copies to plaintiff, or it's attorney.

The court also granted the defendant's motion to compel arbitration, and ordered the parties to submit to arbitration in this matter, as provided for by the Constitution and Rules of the New York Stock Exchange.[FN5] Finally, the court noted that the TRO was entered to maintain the status quo and without prejudice to the merits of the claims of defenses which had been or may be asserted in this litigation. Under the court's order, the TRO was in effect until April 29, 1991.

On April 23, 1991, the defendant filed a motion for an increase in the amount of bond posted by the plaintiff, which was stayed by the court pending resolution of this motion. The defendant also filed a motion to compel expedited arbitration. On the same day, the court heard oral argument on these issues.

The court denied the motion for expedited arbitration, finding that the contractual provisions of the Agreement did not provide for expedited arbitration.[FN6] Because the terms of the Agreement merely required the parties to arbitrate in accordance with the Constitution and rules of the New York Stock Exchange, the court could not force the plaintiff to submit to expedited arbitration. *See e.g., Merrill Lynch v. Cunningham, 736 F.Supp. 887 (N.D.Ill.1990); and Merrill Lynch v. Tobias,* 90 C 20210, U.S. District Court, Western Division (July 17, 1990).

On April 29, 1991, the plaintiff brought this motion

to extend the TRO pending an award and final decision of the arbitration panel in accordance with the Constitution and Rules of the NYSE.[FN7] A few minutes before motion call, the defendant submitted several documents and motions to the court, raising numerous arguments against the extension of the TRO. Defendant submitted a report on the status of the proceedings and accompanying affidavits, objections to plaintiff's motion to extend the TRO, and an answer to the plaintiff's complaint. The court continued the hearing until 5:00 p.m.. The plaintiff, at that time, submitted its response to the defendant's objections. The court extended the TRO one day, and referred the matter to the emergency judge, as this judge was absent from court on April 30, 1991. The emergency judge did not hear the merits of the motions, and the parties agreed to extend the TRO for one day. This court held a hearing on May 1, 1991.

*Discussion*

**\*3** This court has already determined that the dispute in this case is arbitrable, and has ordered the parties to submit their dispute to arbitration. Since that time, Patinkin has complied with the TRO by returning all documents to plaintiff's attorney.[FN8] Although Patinkin, Prudential Bache Securities, and Merrill Lynch have initiated arbitration of their disputes before the New York Stock Exchange, the parties apparently have not agreed to find a mutually convenient date to proceed with arbitration proceedings in Chicago.

Now that arbitration proceedings have been initiated and the documents have been returned to the plaintiff, the defendant asserts that any harm or loss that Merrill Lynch has 'allegedly' suffered prior to the entry of the TRO has ceased due to Patinkin's compliance with the TRO. Defendant reasons that the balance of the equities has now tipped overwhelmingly in favor of Patinkin who will be unable to earn a living while this injunction in force. Defendant also argues that because the plaintiff refuses to go to expedited arbitration, equity and fairness require the court to vacate the temporary restraining order.

Under Federal Rule of Civil Procedure 65, unless there is agreement for extension between the parties, the court cannot extend a TRO without good cause. The Rule provides that a TRO:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1991 WL 83163 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1991 WL 83163)**

... shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for extension shall be entered of record....

This court's reading of the rule is that under Federal Rule of Civil Procedure 65, a court cannot extend a TRO without a showing of good cause. Evidence of good cause is especially important when the TRO has been issued without notice to the other side.[FN9] In the instant case, the defendant did of course, have notice and an opportunity to be heard before the TRO was issued. Therefore, the only question presented here is whether there is good cause to extend the TRO.

The court recognizes that the defendant has returned the documents he removed from Merrill Lynch as required under the TRO. Because the documents have been returned, the only possible remaining harm to plaintiff is that the defendant may solicit its clients. The court finds that this possible harm justifies the extension of the TRO. As the Fourth Circuit Court of Appeals noted in *Merrill Lynch v. Bradley,* 756 F.2d 1048 (4th Cir.1985), a case that was factually similar to this one, the continuing possibility that the defendant will solicit plaintiff's clients justifies the TRO's extension. Without injunctive relief the defendant's conduct might irreversibly damage the status quo:

When an account executive breaches his employment contract by soliciting his former employer's customers, a non-solicitation clause requires immediate application to have any effect. An injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The parties cannot be 'unsolicited.' It may be impossible for the arbitral award to return the parties substantially to the status quo ante because the prevailing parties' damages may be too speculative.

**\*4***Id.* at 1054.

The *Bradley* court therefore concluded that:

[W]here a dispute is subject to mandatory arbitration

under the Federal Arbitration Act, a district court has the discretion to grant a preliminary injunction to preserve the status quo pending arbitration of the parties' dispute if the enjoined conduct would render that process a 'hallow formality.' The arbitration process would be a hallow formality where 'the arbitral award when rendered could not return the parties substantially to the status quo ante.' ...[this] decision will further, not frustrate, the policies underlying the Federal Arbitration Act.

*Id.* at 1053-1054.

Two other courts in this circuit have considered the issue of extending a temporary restraining order, in cases which were factually similar to this one. In *Merrill Lynch v. Cunningham,* 736 F.Supp. 887 (N.D.Ill.1990) and *Merrill Lynch v. Tobias,* 90 C 20210, U.S. District Court, Western Division (July 17, 1990), both courts found that the extension of the TRO was justified because of plaintiff's likely, and threatened loss of clients, and the irreparable harm that plaintiff would suffer if the TRO was not extended. *See also, Merrill Lynch v. Mathes,* No. CY-90-3060-AAM, U.S. District Court, Eastern District of Washington (August 2, 1990) (Injunctive relief extended pending arbitration of parties dispute).

The defendant has attacked the extension of the TRO on a number of grounds. First, the defendant argues that the Agreement is not valid. At the hearing on the motion to extend the TRO, the defendant testified that he was told by his supervisor that he was bound to the terms of the Agreement for only a two year period. Since the Agreement was signed in 1982, Patinkin argues that he is no longer bound to the its terms. The court finds that this argument is not credible, and is not supported by the clear terms of the parties' Agreement, which the defendant admitted he read, and understood before signing.[FN10] No language in the Agreement suggests that it is enforceable for only a limited period of time. The court rejects this position.

Defendant also argues that the TRO should be vacated because the Agreement, which defendant alleges is a restrictive covenant, is unenforceable. Defendant testified that some seventy to eighty percent of the clients he served at Merrill Lynch were long time friends, neighbors, and relatives, which he solicited without any real input from Merrill Lynch.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 4
Not Reported in F.Supp., 1991 WL 83163 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1991 WL 83163)**

Defendant asserts that under Illinois law, since he developed his client base, and provided the information about his clients to Merrill Lynch, the information is not confidential. Defendant reasons that since the information is not confidential, Merrill Lynch does not have a legitimate protectable interest in enforcing the restrictive covenant.

As the court told the parties several times at oral argument, these arguments have little bearing on the court's ruling on the motion for the extension of the TRO. In general, this court will not consider the merits of this case or the overall validity of the Agreement, as that is better left to the arbitration board.[FN11]

**\*5** Even if relevant to this motion, the court finds that the defendant's argument concerning his client base and the restrictive covenant has no weight.[FN12] Defendant's argument regarding the unenforceability of the Agreement as a restrictive covenant is based on Illinois law. Paragraph 4 of the Agreement explains, that the "Agreement shall be construed, and the validity, performance and enforcement thereof shall be governed by the laws of New York." Therefore, Illinois law does not apply.[FN13] Also, the court believes that this argument is weak on its face, since the relevant language of the contract makes no distinction between clients Patinkin brought to the firm, and those supplied by Merrill Lynch.[FN14]

Finally, the defendant pointed out that at least one court in this circuit has declined to extend a TRO pending arbitration of the dispute. In *Merrill Lynch v. Rosenbaum* 90 C 5031 (N.D.Ill.1990), once the defendant returned plaintiff's account information, and plaintiff's claim had been submitted to the New York Stock Exchange, Judge Conlon vacated the TRO because she found that the balance of the equities favored the defendant. Here, this court issued the TRO out of concern for plaintiff's interest in its client base as well as its business records, and therefore declines to follow the *Rosenbaum* decision.

In addition, the court is not persuaded by defendant's argument that he will suffer undue hardship by the loss of Merrill Lynch clients if the TRO stays in effect until this matter is resolved by the arbitration board. The court finds that although this argument has some merit, the defendant has the ability to contact new clients, to solicit business from them,

and to receive customers from Prudential. The court also notes that the TRO does not restrict solicitation of business from family members. Further, while defendant testified as to the hardship he would face if the TRO remained in effect, he also testified that he was given a bonus when he joined Prudential.

Furthermore, defendant's argument that the hardship suffered by his Merrill Lynch clients requires the dissolution of the TRO must be also rejected. Those customers are free to do business with other brokers at Merrill Lynch, or they can transfer their accounts to other brokerage firms. There is no great public harm from the clients' temporary loss of Mr. Patinkin's services. His clients, like those of many others before him, can find other brokers to manage their accounts until this matter is resolved by the arbitration board. The court finds that the balance of the equities does not favor vacating the TRO.

As was noted above, the intent of the court when it entered the TRO on April 19, 1991, was to maintain the status quo without prejudice to the merits of the parties claims or defenses that were or may be asserted in this litigation, until an arbitration panel could hear, and make findings on the issues presented in this lawsuit. It was the court's intention that the TRO would stay in effect until the case was presented to the arbitration panel, which could use its expertise and knowledge in this field to resolve the dispute presented.

**\*6** After reading the submitted documents, the defendant's Answer to the verified complaint, and hearing testimony and oral argument on this motion, the court finds that there is still good cause for the issuance of the TRO. The court bases its finding on its belief that the plaintiff will suffer irreparable harm if the TRO is not extended. In doing so, this court joins several other courts which have found that Merrill Lynch suffers irreparable harm from the solicitation and loss of its clients, and that this is a harm for which there is no adequate legal remedy.

The court also finds that greater injury will be inflicted on the plaintiff by the denial of the extension of the TRO than will be inflicted upon the defendant by granting the extension. The court notes that the injuries which the parties face involve more than economic losses. If the economic status of the parties was the only factor to be considered here defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 5
Not Reported in F.Supp., 1991 WL 83163 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1991 WL 83163)**

might very well prevail on this motion. The court believes that the denial of the extension of the TRO under the circumstances presented in this case would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm plaintiff faces, on several levels, is enormous.[FN15]

Therefore, the court extends the TRO until July 1, 1991, or until the arbitration panel is able to address whether the TRO should remain in effect. The parties are instructed to cooperate with each other in order proceed to arbitration, under the Rules and Constitution of the NYSE, as expeditiously as possible.

### Conclusion

The Plaintiff's motion to extend the temporary restraining order is granted. The TRO will remain in effect until July 1, 1991. The Defendant's motion to vacate the temporary restraining order is denied. Defendant's motion to increase bond to $50,000 is granted. Since the plaintiff refuses to agree to an expedited arbitration hearing,[FN16] and defendant will suffer some harm during the pendency of the TRO, an increase in the bond is warranted. A status hearing is set for 9:30 a.m. on Friday, June 28, 1991.

FN1. The agreement provides that:

1. All records of Merrill Lynch, including the names and addresses of its clients, are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination of my employment for any reason with Merrill Lynch. None of said records nor any part of them is to be removed by me from the premises of Merrill Lynch either in original form or in duplicated or copied form, and the names and addresses and other facts in such records are not to be transmitted verbally or in writing by me except in the ordinary course of conducting business for Merrill Lynch. All of said records or any part of them are the sole proprietary information of Merrill Lynch and shall be treated by me as confidential information of Merrill Lynch.

2. In the event of termination of my

services with Merrill Lynch for any reason, I will not solicit, for a period of one year from the date of termination of my employment in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time, any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch. In the event that any of the provisions contained in this paragraph and/or paragraph (1) above are violated, I understand that I will be liable to Merrill Lynch for any damages caused thereby.

FN2. The court notes that on May 1, 1991, the defendant testified at the hearing on the extension of the TRO and did not deny any of these factual allegations.

FN3. Defendant now argues that the TRO was issued without notice. This argument is meritless. Shortly before motion call for the TRO the defendant filed a motion to compel which was in excess of twenty pages. At oral argument, defendant raised numerous arguments against the issuance of the TRO.

FN4. At the hearing on the motion to extend the TRO, both counsel agreed that defendant was not restrained from accepting business with those Merrill Lynch customers he did not solicit. Hence, Patinkin is free to accept business from any clients he did not solicit. The TRO is accordingly modified to reflect this understanding.

FN5. The court specifically rejected defendant's argument that the Illinois Arbitration Act superseded the Federal Arbitration Act. Because the Federal Arbitration Act is applicable to this action, the court found that it is not bound by the Illinois Uniform Arbitration Act, which is superseded by the Federal Act. (See TRO, ¶¶ 8 and 9, *Conclusions of Law, and* 9 U.S.C. § 2. *See also, Zechman v. Merrill Lynch,* 742 F.Supp. 1359, notes 4 and 6 (N.D.Ill.1990).

The court further found that the Federal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 6
Not Reported in F.Supp., 1991 WL 83163 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1991 WL 83163)**

Arbitration Act did not preclude the issuance of a temporary restraining order in this case, pending arbitration. *See Merrill Lynch v. Tobias,* 90 C 20210, U.S. District Court N.D. Illinois, Western Division (July 17, 1990) (Roszkowski, J.) and *Merrill Lynch v. Cunningham,* 736 F.Supp. 887 (N.D.Ill.1990) (Hart, J.), and *see also, Sauer-Getribe KG v. White Hydraulics, Inc.,* 715 F.2d 348 (7th Cir.1983) (finding that it was error for a district court not to grant injunctive relief pending arbitration of a matter where the plaintiff established the factors for obtaining a preliminary injunction), and *Merrill Lynch v. Bradley,* 756 F.2d 1048, 1052 (4th Cir.1985).

FN6.9 U.S.C. §§ 3-4 of the Federal Arbitration Act specifically states that arbitration can be compelled only "in accordance with the terms of the agreement to arbitrate.

FN7. Merrill Lynch has, in accordance with these rules, notified the Director of Arbitration of the NYSE to open a file in this matter, submitted a fully executed Uniform Submission Agreement, paid the filing fee, demanded the constitution of a panel of three members in accordance with the Rules of the NYSE, requested a cite for arbitration in Chicago, filed a formal claim with the Director of Arbitration of the NYSE, served a request for the production of documents from the defendant as provided for under Rule 619 of the NYSE, and notified opposing counsel of its willingness to contact the NYSE to arrange a hearing date for arbitration.

FN8. The parties agree that Patinkin's attorney will be allowed to keep copies of the document, and to show and discuss the documents with his client for purposes of defending Mr. Patinkin in this litigation, and the pending arbitration.

FN9. See also, *Merrill Lynch v. Tobias,* a case which was extremely similar to this one factually, Judge Roszkowski found that

"Rule 65 presumably contemplates TROs issued without notice to the adverse party. The rule is silent as to whether a TRO issued with notice to the adverse party expires after 10 days." (*Tobias,* at p. 5). Judge Roszkowski found that Illinois law was instructive on this procedural point, and that it suggests that when a TRO is issued with notice to the adverse party, it will not necessarily expire after ten days:

In this regard, Illinois case law indicates that TROs with notice to the adverse party do not necessarily expire after 10 days. In *City of Chicago v. Westphalen,* 93 Ill.App.3d 1110 (1st Dist.1981), the court held that when notice is provided in conjunction with a TRO, the TRO can be issued for a period of greater than 10 days. *See also, Lawter International, Inc. v. Carroll,* 107 Ill.App.3d 938 (1st Dist.1982); *Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B,* 349 N.E.2d 36 (1976). This holding makes sense. The trade-off for an *ex parte* issuance of a TRO is that the TRO has a limited life. *Levas and Levas v. Village of Antioch, Ill.,* 684 F.2d 446, 448 (7th Cir.1982). This type of protection is not required when a TRO is issued with notice and both parties have an opportunity to present evidence before the court.

*Id.* at 6.

FN10. Although the court believes that this is an issue which should go before the arbitration board, for purposes of the motion to extend the TRO, this argument is rejected. The court makes this tentative finding, which is not binding on the arbitration board for the limited purpose of deciding the motion to extend the TRO.

FN11. Indeed, the court specifically declined to turn the motion for an extension of the TRO into a hearing on a preliminary injunction, because issuing a preliminary injunction would require inquiry into plaintiff's likelihood of success on the merits to a greater extent than that required for the

issuance of a TRO. The court agrees that "such a judicial inquiry would inject into the merits of issues more appropriately left to the arbitration panel." *Tobias,* at p. 7.

Similarly, the court also believes that defendant's general argument that the employment agreement is too broad to be enforceable, is also better left to the arbitration board, which is already responsible for finally determining whether the Agreement is enforceable.

FN12. Again, the court notes that these are tentative rulings for purposes of deciding the motion to extend the TRO.

FN13. Similarly, defendant's testimony regarding confidentiality at Merrill Lynch, and how easily he and others gained access to customer names and files is not an issue that this court will deal with at this time. In the initial motion for a TRO, the plaintiff submitted an affidavit explaining how client files are only available to those Merrill Lynch employees who have access to the firm's computer password. Based on this evidence, the court found that the customer lists were intended to be confidential, meaning that they are only intended to be used by Merrill Lynch employees. In light of this reasoning, defendant's arguments regarding his own access to names of Merrill Lynch customers before they became clients of Merrill Lynch is unpersuasive. The point here is that once an individual becomes a client of Merrill Lynch, the firm makes an effort to keep information about that client confidential.

FN14. Paragraphs 2 states in pertinent part that:

In the event of termination of my services with Merrill Lynch for any reason, will not solicit, for a period of one year from the date of termination ... any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch.

FN15. Although the defendant testified that other former brokers at Merrill Lynch kept, retained and ultimately used client information for their own personal benefit, the court cannot rely on these conclusory, hearsay allegations, which lacked sufficient foundation for reliability.

FN16. The defendant determined that the Arbitration Board could hear this matter on an expedited basis on May 8, 1991. The court is now unsure as to when an arbitration hearing will be held.

N.D.Ill.,1991.
Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Patinkin
Not Reported in F.Supp., 1991 WL 83163 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused the **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION; [PROPOSED] TEMPORARY RESTRAINING ORDER**; and **APPENDIX OF  UNPUBLISHED AUTHORITIES IN MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** to be served on Defendant via the following this 16th day of April, 2006:

<u>via Federal Express to</u>:

Paul J. Oblon
1533 Saranell Avenue
Naperville, IL  60540

Paul J. Oblon
Wachovia Securities
55 Shuman Boulevard
Suite 750
Naperville, IL 60563

<u>via facsimile to</u>:

Paul J. Oblon
Wachovia Securities
Facsimile No. (630) 548-6170

and via Federal Express to:

Director of Arbitration
FINRA Regulation, Inc.
1 Liberty Plaza
165 Broadway
27th Floor
New York, NY  10006

Pete S. Michaels, Esq.
Michaels, Ward & Rabinovitz, LLP
12 Post Office Square
4th Floor
Boston, MA 02109

_____ /s/ Gary M. Miller _____

148956v1